Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ALBERTO GONCALVES, derivatively on behalf of PAYPAL HOLDINGS, INC.,

Plaintiff,

v.

JAMES ALEXANDER CHRISS, JAMIE S. MILLER, FRANK KELLER, DIEGO SCOTTI, JOY CHIK, JONATHAN CHRISTODORO, CARMINE DI SIBIO, DAVID W. DORMAN, ENRIQUE LORES, GAIL J. MCGOVERN, DEBORAH M. MESSEMER, DAVID M. MOFFETT, ANN M. SARNOFF, and FRANK D. YEARY,

Defendants,

and

PAYPAL HOLDINGS, INC.,

Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## INTRODUCTION

Plaintiff Alberto Goncalves ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant PayPal Holdings, Inc. ("PayPal" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants James Alexander Chriss ("Chriss"), Jamie S. Miller ("Miller"), Frank Keller ("Keller"), Diego Scotti ("Scotti"), Joy Chik ("Chik"), Jonathan Christodoro ("Christodoro"), Carmine Di Sibio ("Di Sibio"), David W. Dorman ("Dorman"), Enrique Lores ("Lores"), Gail J. McGovern ("McGovern"), Deborah M. Messemer ("Messemer"), David M. Moffett ("Moffett"), Ann M. Sarnoff ("Sarnoff"), and Frank D. Yeary ("Yeary") (collectively, the "Individual Defendants," and together with PayPal, "Defendants") for breaches of their fiduciary duties as directors and/or officers of PayPal, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Chriss, Miller, Keller, and Scotti for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PayPal, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 25, 2025 to February 2, 2026, both dates inclusive (the "Relevant Period").

2. PayPal is a Delaware corporation headquartered in San Jose, California, chiefly engaged in the digital commerce industry. More specifically, PayPal creates products intended to facilitate digital payments, both over the internet and in person. To this end, the Company maintains a global, two-sided network to connect merchants and consumers.

3. Notably, the Company provides specialized services for both the consumer and the merchant sides of its business. Among these specialized services is the Company's "Branded Checkout" segment, namely comprised of the services PayPal and Venmo. The Company's Branded Checkout segment purports to provide customers with the ability to complete purchases without the need to enter address or payment information.

4. The Company mainly derives its revenue from fees charged to customers for the completion of transactions through its various services. These fees are generally calculated from the volume of activity on the Company platform used to facilitate the transaction in question.

5. Throughout the Relevant Period, the Individual Defendants repeatedly emphasized the Company's financial prospects for 2027 in addition to the growth trajectory for its Branded Checkout segment. As such, the Individual Defendants consistently and explicitly underlined the Company's ability to meet its expected financial goals for 2027 through, *inter alia*, the success of the Company's Branded Checkout segment.

6. However, the Individual Defendants failed to disclose the true nature of the prospects for the Company's Branded Checkout segment and its overall ability to meet its expected financial goals for 2027. More specifically, the Individual Defendants failed to disclose the extent to which the Company's staff could increase customer adoption of the Branded Checkout segment's services.

7. For example, on February 25, 2025, the first day of the Relevant Period, the Company hosted its annual Analyst/Investor Day call (the "2025 Investor Call") to discuss the Company's recent and projected businesses. During the 2025 Investor Call, Defendant

Keller stated that "***We're raising the bar on branded checkout. We have an end-to-end plan to accelerate growth***."[1]

8. The truth fully emerged on February 3, 2026, when the Company issued a press release to announce its financial results for the fourth quarter and full year of 2025 (the "Q4 2025 Earnings Press Release"). The Q4 2025 Earnings Press Release quoted Defendant Miller as stating that "***[a]t the same time, our execution has not been where it needs to be, particularly in branded checkout***."

9. Also on February 3, 2026, the Company issued a separate press release (the "February 2026 Transition Press Release"). The February 2026 Transition Press Release announced the appointment of "Enrique Lores as President and CEO, effective March 1, 2026 … succeed[ing] Alex Chriss." The February 2026 Transition Press Release further noted that "[t]o ensure a seamless transition, Jamie Miller, Chief Financial and Operating Officer, will serve as Interim CEO until Lores assumes the role."

10. That same day, the Company hosted an earnings call to discuss its financial results for the fourth quarter and full year of 2025 with investors and analysts (the "Q4 2025 Earnings Call"). During the Q4 2025 Earnings Call, Defendant Miller disclosed that "***in the fourth quarter, online branded checkout TPV grew 1% on a currency-neutral basis, down from 5% in the third quarter. The 4-point deceleration was more than we expected***."

11. On this news, the price per share of the Company's common stock fell roughly $10.63, or approximately 20.3%, from a price per share of $52.33 at the close of trading on February 2, 2026 to close at approximately $41.70 per share on February 3, 2026.

12. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to PayPal, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements

[1] Unless otherwise stated, all emphasis is added.

that failed to disclose, *inter alia*, that: (1) the Company's macroeconomic environment contained substantial risks; (2) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

13. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls while six of the Individual Defendants engaged in lucrative insider trading, reaping combined personal proceeds of ***approximately $12.4 million***.

15. Moreover, the Individual Defendants caused the Company substantial harm by causing it to repurchase its own shares at artificially inflated prices. In total, the Company spent an aggregate amount of approximately $5 billion to repurchase 73.6 million shares of its own common stock at artificially inflated prices from March 2025 to December 2025. In total, this caused the Company to overpay for repurchases of its own stock by over $1.9 billion.

16. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the Individual Defendants' misconduct—which has subjected the Company, its former President/Chief Executive Officer ("CEO"), its Executive Vice President ("EVP")/Chief Financial Officer ("CFO"), and two of its EVP/General Managers to a federal securities fraud class action pending in the United States District Court for the

Northern District of California (the "Securities Class Action"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Chriss's, Miller's, Keller's, and Scotti's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

22. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

24. Plaintiff is a current shareholder of PayPal. Plaintiff has continuously held PayPal common stock since first purchasing shares on February 18, 2021.

### Nominal Defendant PayPal

25. PayPal is a Delaware corporation with principal executive offices at 2211 North First Street, San Jose, California 95131. PayPal's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "PYPL."

### Defendant Chriss

26. Defendant Chriss served as the Company's President, CEO, and as a Company director from September 2023 until his termination from the Company on February 2, 2026.

27. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Chriss made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 15, 2025 | 12,188 | $62.27 | $758,947 |
| July 15, 2025 | 12,188 | $73.89 | $900,571 |
| October 15, 2025 | 55,844 | $69.15 | $3,861,613 |
| January 15, 2026 | 9,724 | $57.66 | $560,686 |

Thus, in total, before the fraud was exposed, he sold 89,944 shares of Company common stock on inside information, for which he received approximately $6.1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28. The Schedule 14A the Company filed with the SEC on April 21, 2025 (the "2025 Proxy Statement") stated the following about Defendant Chriss:

> **Experience, Skills and Qualifications Relevant to Nomination Include:**
>
> • Extensive product, technology and global payments experience
> • Deep expertise in leading high-growth businesses focused on customer-driven innovation
>
> **Other Public Company Boards:**
>
> • None
>
> **Former Public Company Boards within Last Five Years:**
>
> • None
>
> **Career Highlights:**
>
> • President and Chief Executive Officer of PayPal since September 2023
> • Executive Vice President and General Manager, Small Business and Self-Employed, of Intuit Inc. from January 2019 to September 2023
> • Led a global organization responsible for delivering QuickBooks and Mailchimp to millions of customers and for more than half of Intuit's revenue
> • Led Intuit's successful acquisition of Mailchimp, significantly expanding the capacity of Intuit's platform and its customer base
> • Senior Vice President and Chief Product Officer, Small Business organization of Intuit from January 2017 to December 2018
> • Managed the full suite of QuickBooks products, including payroll and payments platform segments
> • Vice President and General Manager, Self-Employed segment of Small Business division of Intuit, Inc. from August 2013 to December 2016

• Various positions of increasing responsibility at Intuit, Inc. from July 2004 to July 2013 including Business Leader and Director, Intuit Partner Platform

(Emphases in original).

**Defendant Miller**

29. Defendant Miller has served as the Company's EVP, CFO and COO since January 2025. Defendant Miller also served as the Company's interim President and interim CEO from February 3, 2026 to March 1, 2026.

30. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Miller made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 15, 2025 | 6,131 | $68.95 | $422,732 |
| June 15, 2025 | 6,130 | $70.83 | $434,188 |
| September 15, 2025 | 6,129 | $66.89 | $409,969 |
| December 15, 2025 | 6,129 | $61.66 | $377,914 |

Thus, in total, before the fraud was exposed, she sold 24,519 shares of Company common stock on inside information, for which she received approximately $1.6 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

31. The 2025 Proxy Statement stated the following about Defendant Miller:

**Career Highlights**

Global Chief Financial Officer of Ernst and Young from February 2023 to June 2023.

Senior Vice President, Chief Financial Officer and Head of Strategy of Cargill from June 2021 to January 2023.

Held a variety of senior positions at General Electric from April 2008 to February 2020, including Senior Vice President and Chief Financial Officer

from November 2017 to February 2020; Senior Vice President and President and CEO of GE Transportation from October 2015 to November 2017; Senior Vice President and Chief Information Officer from April 2013 to October 2015.

Senior Vice President, Controller and Investor Relations at Anthem (formerly Wellpoint) from August 2007 to April 2008 and Lead Partner, Midwest financial services advisory practice at PricewaterhouseCoopers from 2005 to 2007.

Member of the Board of Directors of Qualcomm since May 2020.

(Emphasis in original).

**Defendant Keller**

32. Defendant Keller has served as the Company's EVP and General Manager of the Company's Large Enterprise & Merchant Platform Group since April 2024.

33. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Keller made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 1, 2025 | 9,386 | $71.05 | $666,875 |
| April 15, 2025 | 11,053 | $62.27 | $688,270 |
| June 1, 2025 | 3,205 | $70.28 | $225,247 |
| July 15, 2025 | 907 | $73.89 | $67,018 |
| September 1, 2025 | 3,205 | $70.19 | $224,959 |
| October 15, 2025 | 907 | $69.15 | $62,719 |
| December 1, 2025 | 3,205 | $62.69 | $200,921 |
| January 15, 2026 | 748 | $57.66 | $43,130 |

Thus, in total, before the fraud was exposed, he sold 32,616 shares of Company common stock on inside information, for which he received approximately $2.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34. The 2025 Proxy Statement stated the following about Defendant Keller:

> **Career Highlights**
>
> Senior Vice President, General Manager – Large Enterprise & Merchant Platform Group from November 2023 to March 2024.
>
> Senior Vice President, General Manager Merchant and Payments at PayPal from May 2022 to October 2023.
>
> Senior Vice President, Enterprise Solutions and Digital Commerce at PayPal from January 2021 to April 2022.
>
> Vice President, Europe & Global Inside Sales, Global Sales Transformation Lead at PayPal from June 2019 to January 2021.
>
> Vice President, Global Head of Consumer Segment at PayPal from July 2018 to June 2019.
>
> Served in additional positions of increasing responsibility at PayPal from May 2011 to July 2018.

(Emphasis in original).

**<u>Defendant Scotti</u>**

35. Defendant Scotti has served as the Company's EVP and General Manager of the Company's Consumer Group and of the Global Marketing & Communications Group since December 2023.

36. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Scotti made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 15, 2025 | 4,750 | $62.27 | $295,783 |

| | | | |
|---|---|---|---|
| June 6, 2025 | 3,839 | $73.24 | $281,168 |
| July 15, 2025 | 4,750 | $73.89 | $350,978 |
| July 31, 2025 | 3,269 | $69.01 | $225,594 |
| July 31, 2025 | 569 | $69.77 | $39,699 |
| October 15, 2025 | 4,750 | $69.15 | $328,463 |
| October 30, 2025 | 1,897 | $68.41 | $129,774 |
| October 30, 2025 | 1,800 | $68.47 | $123,246 |
| October 30, 2025 | 141 | $70.20 | $9,898 |
| January 15, 2026 | 3,629 | $57.66 | $209,248 |

Thus, in total, before the fraud was exposed, he sold 29,394 shares of Company common stock on inside information, for which he received approximately $2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37. The 2025 Proxy Statement stated the following about Defendant Scotti:

> **Career Highlights**
>
> Executive Vice President, Chief Marketing Officer at Verizon from October 2014 to November 2023.
>
> Senior Vice President, Chief Marketing Officer at J.Crew from November 2011 to October 2014.
>
> Executive Director, Marketing at Vogue Magazine from August 2008 to October 2011.
>
> Served in a variety of senior positions at American Express from August 1992 to August 2008, including Vice President, Global Advertising & Brand Management from July 2003 to August 2008.

(Emphasis in original).

**Defendant Chik**

38. Defendant Chik has served as a Company director since March 10, 2025. Defendant Chik currently serves as a member of the Audit, Risk, and Compliance ("ARC") Committee.

39. The 2025 Proxy Statement stated the following about Defendant Chik:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• Deep technical expertise in cybersecurity and information security for hyperscale enterprise and consumer services, including leveraging AI to strengthen Microsoft's security product stack. Leads the Microsoft Secure Future Initiative, the largest cybersecurity initiative in Microsoft's history.
• Experience in developing and globally scaling products and services that provide foundational security for Microsoft's enterprise and consumer ecosystem, including leadership of Microsoft's Identity and Network Access organization which has more than doubled its revenue and expanded its portfolio to eight security products.
• Proven record of driving strategy, overseeing operations of organizations undergoing digital transformation, and championing positive culture of large teams at global scale.

**Other Public Company Boards:**

• None

**Former Public Company Boards within Last Five Years:**

• Sierra Wireless (later acquired by Semtech Corp.) from October 2018 to April 2020

**Career Highlights:**

• President of Identity and Network Access at Microsoft since September 2022, leading and growing multi-billion dollar Microsoft Entra business that builds secure access solutions for Microsoft's suite of enterprise and consumer services.
• Over 25 years at Microsoft in progressive leadership roles, including Corporate Vice President for the Identity Division in Microsoft's Cloud + Enterprise group from October 2016 to September 2022, and Corporate Vice President of Engineering from June 2016 to September 2016.

• Has served on the Board of Trustees of non-profit AnitaB.org since May 2016.

(Emphases in original).

**Defendant Christodoro**

40. Defendant Christodoro has served as a Company director since July 2015. Defendant Christodoro currently serves as a member of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee.

41. The 2025 Proxy Statement stated the following about Defendant Christodoro:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• Extensive financial, strategic planning and investment banking experience advising public companies, including at the board level
• Significant experience as both a director and an investor in identifying and evaluating mergers and acquisitions and investment opportunities and portfolio companies across a range of industries, including technology

**Other Public Company Boards:**

• None

**Former Public Company Boards within Last Five Years:**

• Frontier Acquisition Corp. from February 2021 to March 2023
• Pioneer Merger Corp. from November 2020 to January 2023
• Sandridge Energy, Inc. from June 2018 to May 2021
• Xerox Corporation from June 2016 to May 2021
• Herbalife Ltd. from April 2013 to January 2021

**Career Highlights:**

• Partner at Patriot Global Management, LP, an investment management firm since March 2019
• Managing Director of Icahn Capital LP, the entity through which Carl C. Icahn manages investment funds from July 2012 to February 2017.
• Served in various investment and research roles from March 2007 to July 2012

• Began his career as an investment banking analyst at Morgan Stanley, where he focused on merger and acquisition transactions across a variety of industries
• Served in the United States Marine Corps

(Emphases in original).

**Defendant Di Sibio**

42. Defendant Di Sibio has served as a Company director since July 2024. Defendant Di Sibio currently serves as a member of the ARC Committee.

43. The 2025 Proxy Statement stated the following about Defendant Di Sibio:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• Proven leadership experience of a large and complex multinational business
• Deep understanding of business strategy to drive growth and maintain capital efficiency
•Track record of redefining how a sophisticated organization can use technology to transform existing services and create new solutions
• Extensive financial expertise and experience advising regulated financial companies

**Other Public Company Boards:**

• Prudential Financial. Inc. since July 2024

**Former Public Company Boards within Last Five Years:**

• None

**Career Highlights:**

• Global Chairman and Chief Executive Officer of EY, a professional organization that specializes in tax, information technology, and consulting advisory services, from July 2019 to June 2024
• EY Global Managing Partner – Client Service from 2013 to 2019
• Other leadership positions at EY including Chair of the Global Financial Services Markets Executive and Regional Managing Partner of the Americas Financial Services Organization, where he started EY Risk Management and Regulatory Services.

(Emphases in original).

**Defendant Dorman**

44. Defendant Dorman has served as a Company director since June 2015 and as the Chairman of the Board since February 2, 2026. Defendant Dorman currently serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee.

45. The 2025 Proxy Statement stated the following about Defendant Dorman:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• In-depth board chair and executive-level experience leading global companies in regulated industries, including technology, telecommunications, and health care
• Expertise in finance, mergers and acquisitions, investments, and strategic planning
• Public company executive compensation, talent management, and executive leadership expertise

**Other Public Company Boards:**

• Dell Technologies, Inc., since September 2016

**Former Public Company Boards within Last Five Years:**

• CVS Health Corporation from March 2006 to May 2022

**Career Highlights:**

• Founding Partner of Centerview Capital Technology Fund, a private investment firm since July 2013
• Board Chair of InfoWorks, a portfolio company of Centerview since January 2019
• Board of Directors of CVS Health Corporation from March 2006 until May 2022 including Non-Executive Board Chair from March 2011 until May 2022
• Lead Independent Director of the Board of Motorola Solutions, Inc. (formerly Motorola, Inc.), a leading provider of business and communication products and services from May 2011 until May 2015

• Non-Executive Board Chair of Motorola, Inc. from May 2008 to January 2011
• Senior Advisor and Managing Director to Warburg Pincus LLC, a global private equity firm from October 2006 to May 2008
• President and a director of AT&T Corporation from November 2005 to January 2006
• Board Chair and Chief Executive Officer of AT&T Corporation from November 2002 to November 2005
• President of AT&T Corporation, from 2000 to 2002, and the Chief Executive Officer of Concert Communications Services, a former global venture created by AT&T Corporation and British Telecommunications plc from 1999 to 2000
• Served as a Trustee for Georgia Tech Foundation, Inc.

(Emphases in original).

**Defendant Lores**

46. Defendant Lores has served as the Company's President and CEO since March 1, 2026 and as a Company director since June 2021. Previously, Defendant Lores served as the Company's Chairman of the Board from July 23, 2024 until February 2, 2026. Defendant Lores currently serves as a member of the ARC Committee.

47. The 2025 Proxy Statement stated the following about Defendant Lores:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• Deep product and operational experience at the highest levels of the information technology industry
• Proven leader in consumer-facing business with extensive international business and leadership experience and global perspective
• Experience developing corporate strategy including a growth-oriented portfolio, digital transformation, and exceptional talent management

**Other Public Company Boards:**

• HP Inc. since November 2019

**Former Public Company Boards within Last Five Years:**

• None

> **Career Highlights:**
>
> • President and Chief Executive Officer of HP Inc., an information technology company, since November 2019
> • President, Imaging and Printing Solutions, HP Inc. from November 2015 to October 2019
> • Spent over 30 years at The Hewlett-Packard Company in several positions of increasing responsibility ranging from Vice President, Imaging & Printing Group, EMEA to Senior Vice President & General Manager, Business Personal Systems and then Separation Leader from 1989 to 2015

(Emphases in original).

**<u>Defendant McGovern</u>**

48. Defendant McGovern has served as a Company director since June 2015. Defendant McGovern currently serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Compensation Committee.

49. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant McGovern made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 27, 2025 | 2,446 | $72.15 | $176,479 |

Thus, in total, before the fraud was exposed, she sold 2,446 shares of Company common stock on inside information, for which she received approximately $176,479 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

50. The 2025 Proxy Statement stated the following about Defendant McGovern:

> **Experience, Skills and Qualifications Relevant to Nomination Include:**
>
> • Extensive executive experience in strategic planning across a global organization operating in challenging environments, sales and marketing, customer relations, and corporate finance

• Strong expertise in regulatory matters and government relations garnered through leadership positions in regulated industries
• Brings a strong perspective from the academic and nonprofit worlds aligned with PayPal's mission and vision

**Other Public Company Boards:**

• DTE Energy Company since June 2003

**Former Public Company Boards within Last Five Years:**

• None

**Career Highlights:**

• President and Chief Executive Officer of the American Red Cross, a humanitarian organization from June 2008 to June 2024
• Faculty member at the Harvard Business School from 2002 to 2008
• President of Fidelity Personal Investments from 1998 to 2002
• Executive Vice President, Consumer Markets Division at AT&T Corporation from 1997 to 1998
• Serves as a trustee of The Johns Hopkins University School of Medicine

(Emphases in original).

**Defendant Messemer**

51. Defendant Messemer has served as a Company director since January 2019. Defendant Messemer currently serves as a member of the ARC Committee.

52. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Messemer made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 6, 2025 | 3,795 | $73.00 | $277,035 |

Thus, in total, before the fraud was exposed, she sold 3,795 shares of Company common stock on inside information, for which she received approximately $277,035 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the

material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

53. The 2025 Proxy Statement stated the following about Defendant Messemer:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• More than 30 years of experience in finance, strategy, market development, regulation, governance, and operations
• Strong leadership and people management experience as the Managing Partner of KPMG's Bay Area and Northwest region, having led a team of over 3,000 employees
• Extensive expertise in financial reporting, due diligence, mergers and acquisitions, and internal controls over financial reporting as Audit Engagement Partner or Senior Relationship Partner for companies in a variety of industries, including financial services and technology

**Other Public Company Boards:**

• Allogene Therapeutics, Inc. since October 2018
• TPG, Inc. since January 2022

**Former Public Company Boards within Last Five Years:**

• None

**Career Highlights:**

• Served for over 35 years at KPMG, one of the world's leading professional services firms, initially in the audit practice, then as Audit Engagement Partner or Global Senior Relationship Partner for clients in a variety of industries, including financial services and technology. She was Managing Partner of KPMG's Bay Area and Northwest region, responsible for leading teams in 10 offices across all functions from 2008 through her retirement in September 2018
• Served on the Board of Directors of Carbon, Inc., a privately held company

(Emphases in original).

**<u>Defendant Moffett</u>**

54. Defendant Moffett has served as a Company director since June 2015. Defendant Moffett currently serves as the Chair of the ARC Committee.

55. The 2025 Proxy Statement stated the following about Defendant Moffett:

> **Experience, Skills and Qualifications Relevant to Nomination Include:**
>
> • Strong leadership experience and extensive global financial management and regulatory expertise as a former Chief Executive Officer and Chief Financial Officer of financial services companies
> • More than 30 years of strategic finance, mergers and acquisitions, risk management, and operational experience in banking and payment processing
>
> **Other Public Company Boards:**
>
> • Columbia Seligman Premium Technology Growth Fund, Inc. since January 2024
> • Tri-Continental Corp. since January 2024
> • CSX Corporation since May 2015
>
> **Former Public Company Boards within Last Five Years:**
>
> • Genworth Financial, Inc. from December 2012 to May 2021
>
> **Career Highlights:**
>
> • Lead Independent Director of PayPal from July 2015 to December 2018
> • Chief Executive Officer of Federal Home Loan Mortgage Corp. ("Freddie Mac") from September 2008 until his retirement in March 2009, and director of Freddie Mac from December 2008 to March 2009
> • Chief Financial Officer of Star Banc Corporation, a bank holding company, starting in 1993. During his tenure, he played an integral role in the acquisition of Firstar Corporation in 1998 and later U.S. Bancorp in 2001. Mr. Moffett remained Chief Financial Officer of U.S. Bancorp until 2007
> • Serves as a Trustee for Columbia Threadneedle Mutual Funds and University of Oklahoma Foundation and as a consultant to various financial services companies

(Emphases in original).

**Defendant Sarnoff**

56. Defendant Sarnoff has served as a Company director since June 2017. Defendant Sarnoff currently serves as a member of the ARC Committee.

57. The 2025 Proxy Statement stated the following about Defendant Sarnoff:

**Experience, Skills and Qualifications Relevant to Nomination Include:**

• More than 30 years of diversified business experience through a variety of executive leadership roles at preeminent global media companies
• Expertise in driving consumer engagement with a large and diverse spectrum of globally recognized brands
• Proven ability to develop innovative partnerships and technology-focused solutions across platforms
• Extensive technology experience across media and platforms

**Other Public Company Boards:**

• None

**Former Public Company Boards within Last Five Years:**

• None

**Career Highlights:**

• Chair and Chief Executive Officer of WarnerMedia Studios & Networks Group, a global leader in entertainment and consumer products from August 2020 to April 2022
• Chair and Chief Executive Officer of Warner Bros. Entertainment from August 2019 to August 2020
• President of BBC Studios Americas from August 2015 to August 2019
• Chief Operating Officer of BBC Worldwide North America from 2010 to July 2015
• Served on the board of directors of HSN from December 2012 to December 2017.
• Serves as vice chair of the boards of McDonough School of Business at Georgetown and The Shed, and serves as a member of the boards of directors of WTA Ventures and Cineworld Group PLC

(Emphases in original).

**<u>Defendant Yeary</u>**

58. Defendant Yeary has served as a Company director since July 2015. Defendant Yeary currently serves as a member of the ARC Committee.

59. The 2025 Proxy Statement stated the following about Defendant Yeary:

> **Experience, Skills and Qualifications Relevant to Nomination Include:**
>
> • Notable career in investment banking and finance with financial strategy and global mergers and acquisitions expertise, including expertise in financial reporting and experience attracting and retaining strong senior leaders
> • Tenure as both Independent Chair and Interim Executive Chair at Intel enhances acumen in corporate governance and technology industry strategic oversight
> • Extensive experience in corporate governance and stockholder engagement, including as a co-founder of CamberView Partners, a financial advisory firm providing independent, investor-led advice to public companies and their boards
> • Role as a Vice Chancellor and as Chief Administration Officer of a large public research university provides strategic and financial expertise
>
> **Other Public Company Boards:**
>
> • Intel Corporation Independent Chair from March 2009 to December 2024 and Interim Executive Chair since December 2024
> • Mobileye Global, Inc. (majority controlled by Intel Corporation) since October 2022
>
> **Former Public Company Boards within Last Five Years:**
>
> • None
>
> **Career Highlights:**
>
> • Managing Member at Darwin Capital Advisors, LLC, a private investment firm since October 2018 and a Member since 2012
> • Executive Chair of CamberView Partners, LLC, a corporate advisory firm from 2012 to 2018
> • Vice Chancellor of the University of California, Berkeley, a public

university, from 2008 to 2012, where he led and implemented changes to the university's financial and operating strategy
• Spent 25 years in the finance industry, most recently as Managing Director, Global Head of Mergers and Acquisitions and as a member of the Management Committee at Citigroup Investment Banking

(Emphases in original).

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

60. By reason of their positions as officers, directors, and/or fiduciaries of PayPal and because of their ability to control the business and corporate affairs of PayPal, the Individual Defendants owed PayPal and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage PayPal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of PayPal and its shareholders so as to benefit all shareholders equally.

61. Each director and officer of the Company owes to PayPal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

62. The Individual Defendants, because of their positions of control and authority as directors and/or officers of PayPal, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63. To discharge their duties, the officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

64. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its

property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of PayPal, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

65. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

66. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of PayPal were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to PayPal's Code of Business Conduct and Ethics (the "Code

of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of PayPal and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that PayPal's operations would comply with all applicable laws and PayPal's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

67. Each of the Individual Defendants further owed to PayPal and its shareholders

the duty of loyalty requiring that each favor PayPal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

68. At all times relevant hereto, the Individual Defendants were the agents of each other and of PayPal and were at all times acting within the course and scope of such agency.

69. Because of their advisory, executive, managerial, directorial, and controlling positions with PayPal, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

70. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PayPal.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

71. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

72. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

73. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate

applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of PayPal was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

74. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

75. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of PayPal and was at all times acting within the course and scope of such agency.

## PAYPAL'S CODE OF ETHICS

76. PayPal's Code of Ethics states that it "is at the center of our commitment to do the right thing. It goes beyond policies, rules, and laws to provide guidance for behaving ethically and responsibly." The Code of Ethics also states that it "applies to every employee at every level of PayPal Holdings, Inc. and its subsidiaries (collectively, 'Company'), as well as members of our Board of Directors."

77. In a section titled "Maintain Accurate Records," under the subsection "Maintaining Business Records," the Code of Ethics states the following:

> You are responsible for maintaining official business records in accordance with the Company's records management-related policies and records retention schedules.

> This requires:
>
> • Recording and reporting financial and other regulatory or compliance data without misleading, misrepresenting, misinforming, or omitting material information.
>
> • Preserving all documents relevant to accounting, financial and regulatory reporting, litigation, government investigations, or internal/external audits until otherwise notified by Legal.
>
> • Disposing of business records that no longer need to be retained for business reasons, subject to Company policies and local regulations.
>
> Consult PayPal's Enterprise Records and Information Governance Policy for more information.

78. In the same section, under the subsection "Accurate Accounts and Records," the Code of Ethics states the following:

> We have an obligation to our regulators, shareholders, customers, and employees to ensure that our accounts and business records are complete and accurate. Timely preparation of accurate business records is critical for internal decisionmaking, provides evidence of our adherence to our policies and procedures, and serves as the foundation for our reporting to regulators and investors. Maintaining accurate records is consistent with our values and critical in maintaining our reputation for conducting all our business with integrity.
>
> Key reminders:
>
> • You must never falsify, forge, backdate, mischaracterize, improperly alter, or omit material information from any Company document.
>
> • You must ensure that all transactions are lawful and executed in accordance with all Company policies, procedures, and internal controls.
>
> • We must make complete, accurate, transparent, and timely disclosures to regulatory authorities and investors.
>
> We are all collectively responsible for fulfilling this obligation.

79. In a section titled "Avoid Conflicts of Interest," under the subsection "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> Always act in the best interests of PayPal and don't let your personal activities, relationships, or financial interests conflict, or appear to conflict, with the Company's interests. A conflict of interest exists where an employee's activities, relationships, or financial interests interfere with PayPal's best interests. Conflicts of interest can arise in many situations, including:
>
> •Outside business activities, paid or unpaid, for another company, friend, or your own business.
>
> •Personal relationships with family and friends that are connected to your work at PayPal.
>
> •Financial interests in, or board /or advisory positions with, companies that do business or compete with PayPal.
>
> •Business opportunities that you may learn about through your position at PayPal.
>
> •Receiving gifts and entertainment from vendors.

80. In the section titled "Never Trade on Inside Information," under the subsection "Insider Trading," the Code of Ethics states the following:

> Federal, state, and foreign laws prohibit trading in securities by persons who have Material Non-Public Information. This type of insider information may not be used to gain financial advantage when buying or selling stock and may not be passed along to others who may trade on it. In addition, employees may not trade in PayPal stock during Company-specified blackout periods on any stock trading platform. Each of us is subject to different blackout periods depending on our assigned employee classification or, in certain cases, awareness of material information, like a potential significant acquisition.
>
> Consult PayPal's Insider Trading Policy to learn about Company and applicable legal requirements and restrictions with respect to trading in PayPal stock and related securities.

> For any questions about insider trading and related issues, please see Global Stock Plan Services on the HR Hub. See page 46 for more information regarding resources and contacts.

81. In the section titled "We Connect Responsibly With the Public," under the subsection "Advertising and Marketing," the Code of Ethics states the following:

> We are committed to making sure that communications about our Company are accurate and reflect the Company's views and values. We research and document every claim in our advertisements and marketing materials prior to publication to ensure they are accurate, objective, and verifiable. Only employees who are authorized, or individuals who are engaged to speak on PayPal's behalf, may do so. We do not make false or misleading claims. Legal can provide guidance if you are unsure whether a particular claim may be perceived as inaccurate or misleading.

82. In a section titled "Code Administration," under the subsection "Waivers of the Code," the Code of Ethics states the following:

> A Business Ethics Officer (BEO) may waive a provision of the Code for all employees other than Senior Leadership team members. Only our Board of Directors may waive a provision of the Code for a Board member or Senior Leadership Team member, and we will promptly disclose any waiver granted as required by law. Contact your manager or a BEO if you have a question about whether a waiver is required.

83. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of PayPal's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## PAYPAL'S ARC COMMITTEE CHARTER

84. The Company also maintains an Audit and Finance Committee Charter (the "ARC Committee Charter"). The ARC Committee Charter states that the purpose of the ARC Committee is as follows:

> The Audit and Finance Committee (the "Committee") shall provide assistance and guidance to the Board of Directors (the "Board") of PayPal Holdings, Inc., a Delaware corporation (the "Company"), in fulfilling its oversight responsibilities to the Company's stockholders with respect to (i) the Company's corporate accounting and financial reporting practices and the audit of the Company's financial statements, (ii) the independent auditors' qualifications and independence, (iii) the performance of the Company's internal audit function and independent auditors, (iv) the quality and integrity of the Company's financial statements and reports, (v) reviewing and approving all audit engagement fees and terms, as well as all non-audit engagements with the independent auditors, (vi) producing the report that the rules of the Securities and Exchange Commission ("SEC") require to be included in the Company's annual proxy statement; and (vii) various finance matters. In discharging these obligations, the Committee shall maintain and foster an open avenue of communication between the Committee and the independent auditors, the Company's management and internal auditors.

85. In a section titled "Duties and Responsibilities," under the subsection "Financial reporting principles and policies and internal controls and procedures," the ARC Committee Charter states that the ARC Committee will:

> (a) Consider and discuss with the independent auditors any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Committee by the independent auditors required by applicable accounting standards;
>
> (b) Confer with the independent auditors, the internal audit team and senior management in separate executive sessions to discuss any matters that the Committee, the independent auditors, the internal audit team or senior management believe should be discussed privately with the Committee;
>
> (c) Review with the Company's Chief Legal Officer and Chief Risk Officer, as applicable, any significant legal, compliance or regulatory matters that

could have a material impact on the Company's financial statements, business or compliance policies, including material notices to or inquiries received from governmental agencies;

(d) Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

(e) Discuss the types of financial information and earnings guidance (including the use of "pro forma," "adjusted" or other non-GAAP financial measures), and the types of presentations made, to analysts and rating agencies;

(f) Discuss disclosure of key performance metrics, including how the measures are calculated or determined, whether they are consistently prepared and presented and the Company's disclosure controls and procedures related to disclosure of such measures;

(g) Establish hiring policies for employees and former employees of the independent auditors. These policies shall provide that no former employee of the independent auditors may become the Chief Executive Officer; Chief Financial Officer; Senior Vice President, Internal Audit; Chief Accounting Officer; or Controller (or serve in a similar capacity) for one year following the issuance of the opinion of an audit of the Company in which such person participated in any capacity;

(h) Discuss with the independent auditors and management the internal audit department responsibilities, budget and staffing and any recommendations regarding the internal audit department;

(i) Review the significant findings to management prepared by the internal audit department and management's responses; and

(j) Review and discuss earnings press releases.

86. In the same section, under the subsection "Reporting and recommendations," the ARC Committee Charter states that the ARC Committee will:

(a) Prepare the report of the Committee and any other disclosures required by the rules of the SEC to be included in the Company's annual proxy statement and recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K;

(b) Report to the Board on a regular basis and from time to time or whenever it shall be called upon to do so, and make recommendations to the Board as described in this charter and with respect to other matters as the Committee may deem necessary or appropriate;

(c) Consider any reports submitted to the Committee by the independent auditors required by any applicable law or regulation;

(d) Meet with management, the independent auditors and, if appropriate, the Chief Accounting Officer to discuss: the scope of the annual audit, the audited financial statements and quarterly financial statements including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal audit department or the independent auditors, relating to the Company's financial statements, any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management; any critical audit matters; any "management letter" or "internal control" letter issued, or proposed to be issued; any major issues regarding accounting principles and financial statement presentations, including any significant changes to the Company's auditing and accounting principles, policies, controls, procedures and practices, and any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

(e) Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of the Company's internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data,

> any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

87. In the same section, under the subsection "Finance," the ARC Committee Charter states that the ARC Committee will:

> (a) Periodically review the Company's capital structure and strategies, and take such action and make such reports and recommendations to the Board as it deems advisable;
>
> (b) of Review the terms and conditions of material financing plans, including the issuance securities, corporate borrowings, securities repurchases and dividend policy, and make recommendations to the Board on such financing plans;
>
> (c) Review significant capital investments, real estate transactions, and other similar financial commitments;
>
> (d) Review acquisitions and dispositions of businesses or assets, joint ventures, and strategic investments, including the financial performance of such transactions;
>
> (e) Review the Company's treasury activities (including with respect to investments, cash management, foreign exchange and derivatives) and related risks; and
>
> (f) Review the Company's tax strategies, policies and risks.

88. In violation of the ARC Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the ARC Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and

diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the ARC Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

**Background**

89. PayPal is a California-based Delaware corporation whose business operations surround the digital commerce industry. As noted above, the Company creates and markets products and services intended to enable digital transactions. As such, the Company caters to both the consumer and the merchant sides of digital transactions.

90. The Company offers consumers the ability to use a digital wallet for purchases, sending and receiving money, and financial management (including cryptocurrencies). With respect to merchants, the Company offers online branded checkout options as well as online unbranded payments processing. Moreover, the Company offers merchants a buy now, pay later option.

91. As noted above, one of the Company's main businesses is its Branded Checkout segment. The Branded Checkout segment, primarily through services such as PayPal and Venmo, provides customers with the option to complete digital transactions without the need to continually enter payment and address information. Moreover, the Company's buy now, pay later option is included within the services of the Company's Branded Checkout segment.

92. The Company's revenue generally derives from fees charged for the completion of customer payment transactions. In addition, the Company generates revenue from fees stemming from currency conversion, instant transfers of customer funds to their bank accounts or debit cards, and cryptocurrency transactions. Notably, the Company does not generally charge fees for deposits or withdrawals from customer accounts.

93. Moreover, the Company derives revenue from other services such as interest and fees pertaining to consumer and merchant credit products, referral fees, gateway services, and subscription fees.

94. As of December 31, 2025, the Company's network possessed 439 million active accounts throughout roughly 200 markets. In 2025, the Company processed $1.79 trillion of total payment volume ("TPV"). TPV refers to the value of payments (net of payment reversals) successfully completed on a platform and serves as one of the metrics used by the Company to determine its platform scale and the relevance of its products and services.

**False and Misleading Statements**

***February 25, 2025 Investor Call***

95. The Relevant Period began on February 25, 2025 when the Company hosted its 2025 Investor Call. During the 2025 Investor Call, Defendant Chriss stated the following with regard to the Company's Branded Checkout segment and its overall growth prospects, in relevant part:

> We are the #1 branded checkout choice
>
> . . .
>
> ***Well, we've committed from guidance to grow greater than 5% in transaction margin and '25. As we look out into '27, we see high single-digit growth for transaction margin.*** And as we think about all the levers for growth that we have into the future and this transformation into a commerce platform, we believe and have our ambition that we will deliver double-digit transaction margin growth into the future and deliver it responsibly with 20% plus non-GAAP EPS growth.
>
> So this is our vision. This is what we look at as we look into the future. ***We are maniacally focused, and what you will hear throughout the rest of the day is our strategic imperatives that I laid out at our last earnings call are where our teams are focused and executing and they are all in line with the vision that I just laid out. We will win checkout.*** We will scale our omni experience, we will grow Venmo and we will accelerate our SMB penetration.

96. Also during the 2025 Investor Call, Defendant Scotti stated the following regarding the Company's Branded Checkout segment, in relevant part:

> So let's start with PayPal. Branded checkout is the heart of PayPal. And every business in the company has a critical role in driving it. So on the consumer side, it's all about selection, consumer selection. How we drive consumers to select and demand PayPal at checkout, but it doesn't stop there.
>
> Our strategy also drives engagement across our ecosystem of products to increase monetization. Later, you're going to hear from my colleagues, Frank, Michelle and Suzan about how the checkout experience will also drive conversion and how we are going to scale merchant adoption. Now as we always do, let's start with the consumer. So PayPal's value proposition resonates across all demographics. But we are maniacally focused on young families and individuals in their 30s and 40s who have medium to high incomes. This is a very important distinction. They want convenience, and they want to make the most of their money. So for them, we want Paper to be the easiest, the safest and the most rewarding way to pay, to send and to save money, which makes us the smartest way to pay. Now there are 3 pillars that underpin how we drive selection and answer the question, why PayPal pay everywhere, pay your way and get the most value.
>
> . . .
>
> Now what is really important is that if you look at these numbers, every start that we have in this page shows that ***every consumer product leads to checkout.*** And that is a very important distinction for our strategy. ***That's why it's both about having an amazing checkout experience, but it's also critical that we build and we nurture a consumer product ecosystem that drives engagement, that gives us more ways to monetize and that keeps reinforcing selection.***

97. Moreover, during the 2025 Investor Call, Defendant Keller stated the following regarding the Branded Checkout segment's growth expectations, in relevant part:

> So PayPal is not only the smartest way to pay, but it's also for merchants, the smartest way to get paid. And that's why PayPal Checkout is at the core of our flywheel. Diego already talked about this. This is our branded checkout growth formula.
>
> . . .

When we step back, we saw an immense opportunity to bring more consumers into the PayPal ecosystem and ultimately, the branded checkout flywheel.

. . .

Fastlane fuels our branded flywheel with the second opportunity to bring consumers into our ecosystem. Let me tell you, we're watching Fastlane user cohorts extremely carefully. And what we're seeing is interesting, 25% are new to PayPal. And over 50% are inactive, meaning they have a PayPal account, they are no longer using. So it becomes a great channel for us to engage new or lapsed users with branded checkout.

. . .

***So I know you're all interested in understanding our growth expectations for branded checkout. Our plan is to accelerate TPV growth to between 8% and 10% by 2027.***

***We will measure success by growing our new experience share to over 80%, growing pay later usage by more than 20% and growing pay with Venmo by more than 40%, as you heard in Diego's section.***

So to summarize, ***we have a rigorous plan to drive checkout growth***. We're reigniting consumer selection. We have reimagined our checkout experiences and innovate it with Fastlane, and those are highly performing to exceed merchant and consumer needs. And now we're laser-focused on scaling them across our global merchant base. ***When we talk to merchants, they are impressed by our new experiences, which opens doors for having much more holistic conversations about how we help them driving their business***.

. . .

***Merchants typically enter to our ecosystem through branded checkout***, then they adopt processing and move to platform integration which allows us then to add higher-margin value-added services and new innovations. As you can see down there, we have a lot of upside.

. . .

I want to leave you with 3 takeaways. ***We're raising the bar on branded***

> ***checkout. We have an end-to-end plan to accelerate growth***. Our new experiences are delightful for consumers and drive conversion and outcomes for merchants.

98. Also during the 2025 Investor Call, Defendant Miller discussed the Company's financial results, goals, and benchmarks pertaining to its 2027 projections, stating the following, in relevant part:

> Looking ahead, we have a diversified portfolio to drive growth. And what you see on this slide is a more simple and relevant TPV breakout than in the past. It's a better way of how we think about the product portfolio today, our customer needs and our use cases, and we're making progress across each of these areas. ***So the first online branded checkout includes PayPal, branded checkout, eBay and Pay with Venmo. And it's about 30% of our TPV. We have a clear plan and execution milestones to accelerate, and I'll talk about that more in a bit.***
>
> . . .
>
> I want to take a minute and walk you through some of the specific goals and ***ways for you to track our progress underpinning each of the initiatives***. And starting with ***Checkout, which is at the center of everything we do, our new products, partnerships and campaigns are all aimed at accelerating Checkout***. We want to be the easiest, the fastest, the safest solution, and it is essential we deliver more value to customers, and that means higher conversion for merchants and making things even more flexible and rewarding for consumers.
>
> This chart shows our path from 6% volume growth last year to at least 8% to 10% by 2027. Our strategy is underpinned by 3 key building blocks: first, modernizing Checkout solutions to drive higher selection rates. Taking our latest branded checkout experience from about 30% coverage in the U.S. today to more than 80% globally by 2027. Our goal is for these experiences to deliver more than 1 point of conversion improvement to merchants. But the real opportunity is how this impacts selection rate, better experiences, less breakage, more retention, all lead to stickier, more engaged consumers and a higher share of wallet.
>
> . . .

> Now I'll take you through our financial outlook. As you've heard consistently, we are focused on accelerating profitable growth, moving from 5% TM dollars growth, excluding interest in '24 to a range of 7% to 9% by 2027, driving expense leverage, operating margin expansion and share buyback combines for low teens plus EPS growth. And that includes headwinds from lower interest rates and tax rate inflation. And as I mentioned earlier, our long-term ambition is higher. We believe the opportunity in front of us is significant, and we want our team's ambition to be 20% plus EPS growth over time.

99. Later during the 2025 Investor Call, the Individual Defendants conducted a question-and-answer segment with investors and analysts. During the question-and-answer segment, the following exchange occurred between an analyst from JP Morgan Chase & Co and Defendants Chriss and Miller:

> [Q: Tien-Tsin Huang – JPMorgan Chase & Co – Senior Analyst] It's Tien-Tsin Huang from JPMorgan. I just want to ask to accelerate branded checkout. Can you do it at the same economics that you have today? Is there still a price-to-value exercise to go through? Because you make the case that you're doing a lot of work on the consumer, giving a lot of choice, things like that. I'm sure if you unbundle that, there's an interesting exercise there. But I'm curious just about economics and take rate and ARPA, that kind of thing.
>
> [A: Defendant Chriss] Yes. Let me start and then maybe Jamie or anyone else pop in. The way I think about it is, again, ***if we change the game in how we engage with our merchants, branded checkout gets far more valuable for our merchants as well***. So you're already starting to see things like habituation with buy now, pay later. Right, the increase in now bringing buy now, pay later into the experience. ***The uplift it gives for merchants is also economics for us as well***.
>
> But ***what we're starting to see is we're having merchant conversations, and I'm having many of these personally with CEOs of some of our largest merchants, is we are now able to bring them new customers***. And so the people they're bringing into the conversation are their CMOs, are the people talking about customer acquisition. ***And so we're tapping into economics and the relationship that's beyond just their payments person or their Checkout person***. And so I just think, again, it's the biggest mindset shift that I asked you all at the beginning, and I will continue to ask you all to go through now,

which is ***the evolution of a payments company that is just focused on creating a frictionless Checkout experience, which we are still the #1 player in into a commerce company, and I think it just taps us into much broader addressable markets***.

[A: Defendant Miller] Yes. And when -- to add to what Alex said, I mean a lot of what we're doing around branded checkout, driving debit, driving buy now, pay later, driving Pay with Venmo. ***These are all high-margin products in addition to the habituation and other halo effect they bring to branded. And we see that halo effect in the cohorts and in the numbers. And so when you look at take rates, some of those do carry lower take rates, but they're margin accretive. And so margin will be accelerating over the time as we do this, but at the same time, take rate may shift based on product mix and things like that***.

100. Also during the question-and-answer segment of the 2025 Investor Call, the following exchange occurred between an analyst for Wolfe Research, LLC and Defendants Chriss and Scotti:

[Q: Darrin David Peller – Wolfe Research, LLC – MD & Senior Analyst] Well, it's Darrin Peller from Wolfe. Guys, I just want to understand a little bit more. You've had great data on the Checkout experience getting better and you have such a great runway there and how many monthly active users you have is really a differentiator. But how do we help us understand the steps you're going to take to convince the consumer, really light the fire under a consumer to say, from here on, I'm going to use Pay with Venmo. I'm going to use PayPal when maybe they didn't before. Beyond just the Checkout experience getting better, something has to really, I think, ignite them. Help us understand the steps, marketing, loyalty, anything else that would be helpful to get -- and where does that 34 transactions per month or per year rather? Where is that going to go over the next few years?

[A: Defendant Scotti] Yes. ***Let me go back to the point about the shift on the mindset because we are moving from a value proposition that was only about Checkout***, meaning a button to a value proposition about data, which means we want people to stay, we want consumers to stay in our ecosystem because there is a much larger equation of value from them when they do more with PayPal. So ***it starts with Checkout. As we were saying before, now we are connecting the rest of the products from the ecosystem to check out like never before, from debit to pay later, to Pay with Venmo, even crypto now***.

And that is going to create not only habituation, but on top of that, we're also going to build rewards that are going to give you really a lot of reasons for you to stay on that ecosystem. And I said it very quickly during the presentation, but we are thinking on rewards and -- because we are the only ones that can do it that will really connect PayPal first-party rewards not only on just payments, but the whole ecosystem, so you really get more for doing more with us. And then merchant rewards as well that would be merchant funded, connecting also through our smart wallet with the rewards program from our merchants.

***So when you put all of this together, you're going to get so much value as a consumer that is going to be really compelling for you to stay with us***. On top of that, and you saw what we did last September, our marketing is also changing to, number one, help you think differently about PayPal. It's not just for some purchases or just for online purchases, it's for all purchases. And that is a massive change for the way the consumer thinks about PayPal, which in combination with the other things, is going to allow us to keep you super engaged with our brand.

[A: Defendant Chriss] Just to add on to -- pile on to what Diego was saying. ***I think the fact that we have both sides of the ecosystem gives us an opportunity to create completely differentiated experiences.*** We are consumer-obsessed and merchant obsessed. I think there are other players out there and other platforms that actually looked at while driving customers, disintermediate the customer from the merchant because they actually want to own that relationship. We don't have to play that game. We actually can -- if you look at that commerce API, we can provide the merchant with the information to personalize the experience for that consumer and drive loyalty into the consumer's wallet because the consumer is engaging with us on a daily basis.

And so when you think about a loyalty experience, I mean, everyone think back to the '90s when you had a thick wallet with a whole bunch of loyalty cards sitting in there. Those have gone away as you've now moved to a phone. But that also means that your relationship with your local merchant, your relationship with that loyalty platform has gone away as well. ***I think we have an opportunity to bring that back. So that consumer understands that, hey, this is where I make my purchases all the time. And this is where I want my rewards and my loyalty to be, and the merchant gets to have a deeper relationship with those consumers. And I think we have a very, very unique***

***opportunity to create that flywheel***.

101. Moreover, during the question-and-answer segment of the 2025 Investor Call, the following exchange occurred between an analyst with BofA Securities and Defendant Miller:

> [Q: Jason Alan Kupferberg – BofA Securities – MD in US Equity Research & Senior Analyst] I wanted to follow up on brand checkout. When do we start this path towards acceleration. We're talking about 300 basis points 2 years from now. When does it start? Is it late this year? Is it first half of next year? Talk about cadence. And then just in terms of geographic mix, our understanding right now, U.S. is growing a little slower than international. So does the bulk of the acceleration in the next couple of years come from the U.S.?
>
> . . .
>
> [A: Defendant Miller] So Jason let me talk about that in maybe 2 parts. The first is really thinking about margin dollar growth over the next couple of years, and then I'll pivot and talk a little bit about the U.S. From a margin dollars perspective, ***our guidance this year assumes 100 basis points of shift in margin***. And certainly, all the things I talked about are a part of that and a significant part of that. ***Branded checkout, we're already at 30% penetration in the U.S. on the merchant experiences***. All the work Diego has done around offline, debit, marketing, that stuff you're going to see us continue and be very focused on as we move through '25.
>
> So what I'd say to that is it will be a gradation over the period of time is how to think about transaction margin. ***When we come over to branded checkout, the U.S. side of it, we are very, very focused on U.S. growth with branded checkout. It is something that has the full weight of the organization behind it***. We have very, very strong market positions internationally. We expect growth there too and to continue taking share, but the U.S. is a big, big focus there. And Frank talked about the merchant experience as being a key part of that. The other piece of it, and I really want to make sure we make this link is all of the things that we're doing offline, that habituation really does come back into more MAAs better halo effect, higher branded checkout use in the funds flow that works through the products and that's both to PayPal. And branded, it's also on Pay with Venmo and how Venmo habituates the same way. So all of that comes into play there.

102. In addition, during the question-and-answer segment of the 2025 Investor Call, the following exchange occurred between an analyst for Sanford C. Bernstein & Co., LLC and Defendant Chriss:

> [Q: Harshita Rawat – Sanford C. Bernstein & Co., LLC – Senior Researcher] Harshita with Bernstein. So Alex, Jamie, I want to follow up on the 6% to kind of 8% to 10% branded TPV acceleration. You discussed a number of initiatives and modern experiences, which will drive that. How do you factor in the competitive dynamics with respect to Apple Pay coming online, Shop Pay, other buy now pay later kind of factoring into your outlook?
>
> [A: Defendant Chriss] Yes. It's a great question. And obviously, ***we spend a lot of time benchmarking ourselves versus competition***. The first thing I'd say is we have to have a best-in-class experience for consumers. And that's what you saw today, which is -- and I've been very consistent. If you go back a year ago, that branded checkout experience, particularly on mobile, as Frank walked through today was entering your e-mail, entering your password, it was very clunky. ***And our ability to now leapfrog competition and ensure that we have the best-in-class consumer experience is step 1***.
>
> But ***that is insufficient. I think if we are here 3, 4 years from now talking about a frictionless Checkout experience, we, as an industry, have failed***. This has to now turn into commerce experience. This has to turn into experience, where you as a customer are getting a personalized Checkout experience, just like you saw on screen today where I go into my store, I go to Checkout, and I'm getting in our case, a button that is speaking to me. It knows me, it's personalized to me. It's giving me the right reward. It's understanding the loyalty that I have with this merchant.
>
> ***That, to me, is a completely different experience. And I think we are the only ones with a 2-sided ecosystem with access to merchants at scale with access to 80 million-plus shopper profiles and access to hundreds of millions of consumers on an open agnostic platform to be able to deliver that next version of commerce***. So we need to keep looking at competition. We need to get to best-in-class on the current experience, but we are focused on innovating for the future and being the leaders in the next version of commerce.

103. The statements in ¶¶95-102 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company's macroeconomic environment contained substantial risks; (2) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***April 21, 2025 Proxy Statement***

104. On April 21, 2025, the Company filed the 2025 Proxy Statement. Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

105. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (1) re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board; (2) approve, on advisory basis, the compensation for the Company's named executive officers; (3) approve an amendment to the Amended and Restated 2015 Equity Incentive Plan (the "2025 Amendment of the 2015 Equity Incentive Plan"); and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

106. The 2025 Proxy Statement states that the 2025 Amendment of the 2015 Equity Incentive Plan would, *inter alia*, increase the aggregate number of shares of common stock available for grant by 15 million shares. The 2025 Proxy Statement states that, as of April 9, 2025, 31,711,814 shares were still available for grant, meaning that if the 2025 Amendment of the 2015 Equity Incentive Plan is approved, the Company will have approximately 46,711,814 shares available for grant. The 2025 Proxy Statement identifies

that under the 2025 Amendment of the 2015 Equity Incentive Plan, "[a]wards may be granted to employees, directors, and consultants of the Company and employees and consultants of any subsidiary of the Company on the basis of their service." The 2025 Proxy Statement states that if the 2025 Amendment of the 2015 Equity Incentive Plan is not approved, the Company's incentive plan would continue to be administered in its current form.

107. Regarding "Risk Oversight," the 2025 Proxy Statement stated the following:

> PayPal operates in approximately 200 markets globally in a rapidly evolving environment characterized by a heightened regulatory focus on all aspects of the payments industry. Accordingly, our business is subject to the risks inherent in the payments industry generally. A sound risk management and oversight program is critical to the successful operation of our business and the protection of our Company, customers, employees, and other stakeholders. Management is responsible for assessing and managing risk and views it as a top priority. The Board is responsible for overall risk assessment and management oversight and executes its responsibility as a group and through its committees, which report at least quarterly to the full Board. The Board and its Committees consult with external advisors, including outside counsel, consultants, auditors, and industry experts, to help ensure that they are well informed about the risks and opportunities pertinent to the Company.

108. Regarding the Code of Ethics, the 2025 Proxy Statement stated the following:

> Our credibility and reputation depend upon the good judgment, ethical standards, and personal integrity of each director, executive officer and employee. PayPal's Code of Business Conduct and Ethics ("Code of Conduct") requires that our directors, executive officers, and all other employees disclose actual or potential conflicts of interest and recuse themselves from related decisions. Directors, executive officers and other employees are expected to avoid any activity that is or has the appearance of being a conflict of interest with the Company. This includes refraining from engaging in activities that compete with, or are adverse to, the Company, or that interfere with the proper performance of an individual's duties or responsibilities to the Company. In addition, our Code of Conduct prohibits the use of confidential company information, company assets or position at the Company for personal gain.

> We update our Code of Conduct and related policies annually to ensure that they provide clear guidance and align with market practice and evolving legal/regulatory changes. Additionally, to foster a strong culture of compliance and ethics, we conduct local outreach and awareness sessions globally, as well as annual risk and compliance training for all employees and contractors, which covers areas such as our Code of Conduct, anti-money laundering, information protection awareness, data privacy, anti-corruption, safety and security, and sexual harassment prevention. In addition, upon joining PayPal and annually thereafter, our employees must certify that they understand and will comply with our Code of Conduct. In 2024, PayPal achieved 100% completion for its annual risk and compliance training for the ninth consecutive year. Any amendments or waivers to our Code of Conduct requiring disclosure under applicable SEC or Nasdaq rules will be posted on our website.
>
> Concerns about accounting or auditing matters or possible violations of our Code of Conduct should be reported under the procedures outlined in our Code of Conduct. Among our many safe, easy-to-use reporting channels we provide a global Integrity Helpline, which is available 24 hours a day, seven days a week in multiple languages. Reports to the Integrity Helpline are confidential and can be made anonymously.

109. Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary caused the 2025 Proxy Statement to be false and misleading by failing to disclose, *inter alia:* (1) the Company's macroeconomic environment contained substantial risks; (2) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

110. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the

Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

111. As a result of Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on advisory basis, the compensation for the Company's named executive officers; (3) approve the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

112. As the result of shareholders voting to approve the 2025 Amendment of the 2015 Equity Incentive Plan, an additional 15 million shares were made available for grant.

***April 29, 2025 Earnings Call***

113. On April 29, 2025, the Company reported its financial results for the first quarter of 2025. That same day, the Company hosted an earnings call to discuss its financial results for the first quarter of 2025 with investors and analysts (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Chriss stated the following about the Company's first quarter results for 2025, in relevant part:

> Turning to Q1. We have so much to be proud of. Let me share just a few highlights. Our strategy is designed to improve PayPal's profitability over time. In Q1, we delivered our fifth consecutive quarter of profitable growth, with transaction margin dollars growing by 8%, excluding the impact from last year's leap day. ***That growth was driven by multiple sources across our***

***strategic initiatives, including omnichannel commerce, both online, branded checkout and off-line branded payment methods, Venmo and PSP***. As a result of this focus on profitability, non-GAAP earnings per share increased 23% year-over-year.

Additionally, PayPal and Venmo are being used by more people more often. Both total active accounts and monthly active accounts grew a healthy 2% in the quarter. Transactions per active account ex PSP grew 4%, reflecting improved engagement and transaction growth in online branded checkout and Venmo.

As we expand our offerings from online to everywhere, ***the best way to see the traction we're gaining is through branded experiences TPV. Branded experiences comprises volume from PayPal and Venmo online checkout as well as branded in-store payment methods like debit and Tap to Pay***.

***In Q1, branded experiences TPV grew 8%, excluding last year's leap day. That's a full 2 points higher than branded experiences' growth for the full year of 2024, highlighting the growing contribution of our omnichannel initiatives. It's still early days, but we are very proud of this progress***.

Within branded experiences, we're continuing to accelerate the rollout of our upgraded online branded checkout flows. This includes our simplified and modernized paysheet design, with streamlined log-in and reduced latency. ***Since the beginning of the year, we've driven a 25-point jump to more than 45% of U.S. checkout traffic. This shows we can execute, and we anticipate an even faster rollout for Europe starting in the second quarter***.

And finally, Venmo had another standout quarter. We hit an important inflection point for Venmo monetization, with 20% revenue growth, driven by our push to make Venmo one of the best ways to pay online and in-store.

***These are only a few examples of the strength we're seeing in the execution of our strategy. We're feeling the excitement of our innovations in the market and the engagement from our consumers and merchant partners, and we're just getting started.***

. . .

***Starting with win checkout. Online branded checkout TPV, including PayPal and Pay with Venmo, grew nearly 6% this quarter, accounting for***

> ***last year's leap day. We're proud of this growth and expect it to increase over time as more traffic flows through our upgraded experience*.**
>
> . . .
>
> Today, our PayPal and Venmo debit cards are enabling our customers to use their balance to shop anywhere cards are accepted. Adoption is strong and growing, with approximately 2 million first-time PayPal and Venmo debit card users in the quarter, an increase of nearly 90% from last year. Debit card TPV grew approximately 64% in the first quarter. Venmo debit card monthly active accounts grew nearly 40%, and penetration has reached to 6% of Venmo MAAs.
>
> We are focused on getting these products into the hands of even more of our customers because they allow them to choose PayPal and Venmo as their way to pay more often. In the first quarter, users who adopted the PayPal debit card transacted nearly 6x more and generated more than 2x the average revenue per account, compared to those who used online branded checkout only. ***There is also a halo effect where debit card users choose PayPal more often in online branded checkout***.

114. Also during the Q1 2025 Earnings Call, Defendant Miller stated the following, in relevant part:

> ***In the first quarter, online branded checkout volumes grew more than 4% on a currency-neutral basis. And excluding last year's leap day, which contributed over 1 point to growth, online branded checkout volumes increased nearly 6%. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as Tap to Pay, grew 8% ex leap day***, accelerating from the prior year.
>
> . . .
>
> Moving to more financial detail on Slide 8. ***Transaction revenue was flat on a spot basis or up 1% on a currency-neutral basis to $7 billion, driven primarily a branded checkout, Venmo and SMB processing***. This growth was offset by the shift away from unprofitable Braintree volume that I just mentioned.

115. Later during the Q1 2025 Earnings Call, the Individual Defendants conducted

a question-and-answer segment with investors and analysts. During the question-and-answer segment, the following exchange occurred between an analyst for Mizuho Securities USA LLC and Defendant Chriss:

> [Q: Dan Dolev – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst] Great results here. Really appreciate it. Can you give us like a sense of -- it looks like the branded experience TPV strategy is doing really well. Can you give us maybe a sense of like how much traction you're getting there and what you're doing to get those nice results?
>
> [A: Defendant Chriss] Yes, Dan, let me start. So good to hear from you. We've got -- this is the strategy that we've laid out really coming to light. So first, ***we have a branded checkout strategy that is really about driving habituation everywhere that the customer wants to pay***. We have such strong brands in both PayPal and Venmo, and our customers are asking to be able to leverage that trust, the safety, the brand, the rewards in every purchase that they make.
>
> ***And so we've been focused on not only improving that online experience that we've talked about, and I'm sure we'll talk about more, making it available for them exactly how they want to pay, whether that's immediately or with pay later scenario, with buy now, pay later, but then also off-line***.
>
> And you mentioned branded experiences. This really is enabling our PayPal debit card or our Venmo debit card to be accessible to our consumers. ***We saw PayPal debit card TPV growth over 100% in Q1. And that really is driving habituation. This is driving our consumers to actually start to come back, move online and start to pay with PayPal wherever they see it***.
>
> ***So the strategy is working. TPV, up 8% overall in branded experiences. And this really is the metric that we are focused on and we hope you're focused on as well because, again, it is really all about the strategy that we've laid out***.

116. Also during the question-and-answer segment of the Q1 2025 Earnings Call, the following exchange occurred between an analyst for BofA Securities and Defendants Chriss and Miller:

> [Q: Jason Alan Kupferberg – BofA Securities – MD in US Equity Research

& Senior Analyst] So it looks like online branded, you were stable on an underlying basis here in Q1 at up 6%. But now we've got almost half the U.S. on the new checkout experience. It sounds like Europe is on tap to start pretty soon. So could we start to see some initial acceleration in online branded volume growth by the end of this year if the macro stays stable? And can you just give us a word on what the U.S. versus international branded split looked like in terms of Q1 growth rates?

[A: Defendant Chriss] Jason, thanks. So again, ***just to unpack our branded strategy, I'd really think about it as 3 parts. One is the improved branded checkout experience. And as you mentioned, we're -- we've moved very quickly up now over 45% in the U.S.*** Again, that still is -- think of that as sort of double digits of our global transactions. And so ***we're really excited. We think we've got a really strong playbook now. And we think, as we start to roll this out into Europe, we'll actually accelerate even faster***. But our paysheet redesign is holding, the improvement is holding, and now this is just about scaling.

***Second lever is really accelerating Pay with Venmo***, and you've seen the results there. So very, very fast flywheel starting to happen from a Pay with Venmo perspective. TPV up over 50%, and MAAs up over 30%.

***And then the third lever is buy now, pay later and our pay later products***. And again, TPV up over 20%.

***So you add all 3 of those together, and as we continue to see us leaning into those 3 levers, I don't know the exact timing of when we'll start to see branded checkout, but we put pretty strong growth numbers of 8% to 10% by 2027***. And I think those 3 levers are -- continue to give us confidence that we're executing well and heading in that direction.

[A: Defendant Miller] Good. And then, Jason, what I would just add to that. When you look at the paysheet redesign, I would say we think about that as ramping over time. I mean this is something that as things come on, transactions start flowing, it's not something that is an immediate translation. And we do see impact coming through the numbers, but it's very small so far. So maybe that's how I would position that piece of it.

When you look at the U.S. and international, I guess I'd start with the U.S. and saying performance was relatively consistent with the fourth quarter. And we are beginning to see good traction across U.S. MAAs, across TPA, across

shifting to power -- more upstream to more power users. And Alex mentioned Pay with Venmo, which is really -- had good traction there.

***It is early, but we talked in the fourth quarter about seeing some shifting in our U.S. branded checkout levels. We saw that hold again this quarter, watching it very closely but cautiously optimistic about that***.

And then on the outside the U.S. side, relatively consistent as well, a little bit of macro volatility across the markets. But in Europe, we continue to take share in Continental Europe, including in Germany. Really strong brand presence, as you know, across merchants, across consumers.

And I think what we're really excited about is that we're bringing our new product innovation to the market in Europe starting this quarter. ***So we'll start with Germany and the U.K.*** And this is the checkout redesign. It is buy now, pay later.

It is omni and NFC launches. And brand marketing to accompany all of that, with a fast follow to other countries after that.

***So I think the overall look right now, we feel pretty good about branded checkout and just laser-focused on our execution.***

117. Also during the question-and-answer segment of the Q1 2025 Earnings Call, the following exchange occurred between an analyst for UBS Investment Bank and Defendant Chriss:

[Q: Timothy Edward Chiodo – UBS Investment Bank – Analyst] I want to dig in a little bit more to Germany and the U.K. I believe they're the 2 largest branded markets outside of the U.S., particularly from a gross profit standpoint. I believe they are 2 of the largest markets for branded. Two topics I was hoping we could touch on. One is a little bit about the competitive landscape in those 2 markets specifically. And then on the U.K., I know there were some efforts to roll out biometrics to help with 2-factor authentication. And I was hoping you could talk a little bit about the progress and the phasing of that initiative.

[A: Defendant Chriss] Yes. Let me get started, Tim. So as you said, 2 very important markets for us and strong markets outside of the U.S. Competitive dynamics is a little bit different, so let me unpack them. ***Germany, we are***

***really the market leader there. We're -- I think we're the #1 brand in Germany for the last 3 years. So very, very strong consumer presence. Very strong merchant presence***.

***It's also a different type of market. As I just mentioned, it was not a -- it's not a credit-heavy market. So the way PayPal is used is we're connected to bank, and then PayPal is used as really the way to make an online purchase. And so our transactions in e-commerce in Germany are extremely high. That's what gives us a lot of confidence as we now move into off-line, is we're really going to be really one of the first at-scale, bank-connected, off-line wallets that we think will be able to drive significant penetration into the market***.

So we're really excited about that as well as bringing some new innovations to market with not only our rewards program, but also the buy now, pay later connected element as well. ***So with the brand presence we've got in Germany, with the banks already connected and the onboarding experience, that's just really delightful. I mean it's literally one click from your bank to be able to set up your off-line wallet. And with the innovation of rewards and buy now, pay later, we're really excited to get into the market there***.

***U.K., much more competitive dynamic there. We've really suffered in the last few years with what I would consider to be one of our poorest app experiences for consumers***. We're rolling out a new app experience in the U.K. shortly. But we've already started with, as you mentioned, the biometrics. So we actually got a favorable connection with the regulator there to enable us to -- enable our biometrics to be considered 2-factor authentication. That's rolling out quickly and enabling a much better experience, whereas before, it really was choppy and created a lot of friction and a lot of latency in the experience.

***Biometrics is now really creating a seamless experience. You add on top of that the new app that's going to be rolling out and then our rewards program and all the other innovation that we brought to bear. And we think we're going to be competing quite well in the U.K. And you'll see us leaning in from a go-to-market perspective as well to really remind consumers that we now have the best product in the market***.

The last thing I'd say is I was actually just there a few weeks ago, and I think there's a big opportunity for us in buy now, pay later. Actually, I sat down with a lot of merchants in the market, and they're really looking for PayPal to

> come in. There's a lot of different options that are available now. And I think we're hearing from merchants that PayPal is a beloved, trusted brand that they would love to be able to have their consumers have a single onetime checkout or buy now, pay later option from a single brand. And so we're going to lean in heavily in buy now, pay later in the U.K. as well.

***July 29, 2025 Earnings Call***

118. On July 29, 2025, the Company reported its financial results for the second quarter of 2025. That same day, the Company hosted an earnings call to discuss its financial results for the second quarter of 2025 with investors and analysts (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Chriss stated the following with regard to the Company's Branded Checkout segment, in relevant part:

> Turning to our second quarter performance. ***We delivered our sixth consecutive quarter of profitable growth despite the macro uncertainty***. Transaction margin dollars grew 8%, excluding interest on customer balances. ***Success across many of our strategic initiatives contributed to that growth, including online and off-line branded experiences, payment services and Venmo***. This highlights a healthy business with multiple avenues to sustain and accelerate growth, and non-GAAP earnings per share increased 18% year-over-year. We continue to build upon our broad reach and strong engagement. Both total active accounts and monthly active accounts grew 2% in the quarter. Transactions per active account ex PSP grew 4% as more people use PayPal and Venmo more often.
>
> ***If we look at our 4 strategic growth drivers: Winning checkout, scaling omni and growing Venmo, driving PSP profitability, and scaling our next-gen growth vectors, we are making meaningful and tangible progress on all 4***. I'd like to walk through each one, highlighting examples of our progress. ***The first 2 growth drivers are entirely focused on improving and growing our branded experiences. I'm proud that we drove 8% currency-neutral growth in branded experiences TPV this quarter. This positive result reflects the benefit of meeting our customers wherever they choose to shop with PayPal and Venmo, online and offline***. As a reminder, branded experiences includes winning Checkout, expanding buy now, pay later, winning with Venmo and scaling omnichannel capabilities.

> Starting with online branded checkout. TPV, including PayPal, BNPL and Pay with Venmo, grew 5% currency neutral in the second quarter, consistent with what we've been seeing over the past year. ***Our upgraded experiences are driving the uplift we expected, and most of our merchants and consumers are behaving consistently with recent quarters. At the same time, we offset headwinds from platforms and merchants in Asia, where we saw volumes decelerate following the implementation of tariffs***.
>
> Our focus is on the things that are within our control and that we know will have a positive impact on our overall growth trajectory over time. That starts with driving more traffic through our upgraded checkout experiences, both in the U.S. and internationally. ***These upgrades offer a much better consumer experience, improved presentment of BNPL and drive meaningful conversion rate improvements. This is currently rolling out in the U.S., Germany and the U.K., and we have a comprehensive playbook that we will apply to other countries***. Around mid-teens percent of our global transactions are now on our latest experience, including more than 60% of our U.S. checkout transactions.
>
> We are also investing in key use cases like subscriptions to drive repeat branded checkout use. Many of these efforts that are contributing to growth this year will continue to ramp into next year and add to our confidence that we are on track to achieve our growth outlook for branded checkout TPV.

119. Also during the Q2 2025 Earnings Call, Defendant Chriss stated the following with regard to the launch of "PayPal World," a new feature which purported to further boost the growth potential of the Company's Branded Checkout segment, in relevant part:

> Finally, I'd like to explain how last week's announcement of ***PayPal World will be a game changer for our branded experiences***. Digital wallets have become ubiquitous and the standard for making a payment or sending money worldwide. Today, almost 3.5 billion people rely on digital wallets as their go-to method for shopping and transferring funds. That's 83% of global digital payments happening through wallets, and the number is only going to continue growing. There will be over 5 billion wallets globally by 2026. But among those billions of users, there are hundreds of regional wallets represented. This fragmented system of wallets poses tremendous challenges and immense friction in a global commerce ecosystem.

For consumers, it means you are never quite sure if and where your wallet will be accepted. Even for wallets like PayPal with tremendous global reach, there are large regions of the world and millions of merchants that are closed off. For many users with regional wallets, traveling out of the country poses new challenges with spotty or no acceptance and the need to create and keep track of multiple wallets just to interact with the world. And while P2P payments should be easy, the need for a common wallet between users often makes it impossible to send money to friends or family around the world.

For businesses, it means building the technology to accept dozens of wallets, which adds unnecessary costs and creates a fractured experience full of friction for customers, ultimately limiting reach and, of course, sales. When you want to sell to the world, how do you choose which wallets to accept and which customers to turn away? You shouldn't have to make that choice. ***This is where PayPal World comes in to make it simple and easy to connect any consumer with any merchant***. Five of the largest digital wallets in the world, PayPal, Venmo, Mercado Pago, Tenpay Global and UPI are coming together on a seamless global platform. So you can now use your preferred wallet anywhere in the world.

***For our PayPal merchants, PayPal World will mean access to billions of new customers through their existing branded checkout integration***. Now a UPI user in India who wants to buy a pair of sneakers from an online store in Germany that accepts PayPal can simply click the PayPal button at checkout and their familiar UPI button will be presented for them to complete the transaction. It's that simple. ***This means our connections for branded checkout will extend beyond our 400 million customers to more than 2 billion consumers worldwide, and that will continue to grow***.

120. Moreover, during the Q2 2025 Earnings Call, Defendant Miller stated the following, in relevant part:

Total payment volume grew 6% at spot and 5% on a currency-neutral basis to nearly $444 billion. Looking across the product portfolio, there are a few key areas I'd like to highlight. As Alex noted, we are driving faster growth at Venmo. Venmo TPV increased 12%, its highest rate of growth in 3 years. In addition to driving more awareness and usage of commerce capabilities, we have been focused on improving core product and user experiences, which contributed to a P2P acceleration in the quarter. ***Branded experiences TPV,***

> ***which includes online checkout, PayPal and Venmo debit as well as Tap to Pay posted another quarter of 8% growth***.
>
> While debit and tap-to-pay spend represent a smaller amount of volume in branded experiences today, they are growing rapidly and are up more than 60% year-over-year. ***Winning checkout remains our most critical priority. Our teams are laser-focused on advancing the many initiatives that reinforce our checkout business. In the second quarter, online branded checkout volumes grew 5% on a currency-neutral basis***. This was relatively consistent with the growth we delivered over the past few years. At the same time, the macro and consumer spending environment has been uneven. As we moved through the quarter, we observed a slight softening in retail spending in the U.S., most apparent in areas likely impacted by tariffs such as Asia-based marketplaces with higher exposure to goods sourced from China[.]

121. Later during the Q2 2025 Earnings Call, the Individual Defendants conducted a question-and-answer segment with investors and analysts. During the question-and-answer segment of the Q2 2025 Earnings Call, the following exchange occurred between an analyst for Barclays Bank PLC and Defendants Chriss and Miller:

> [Q: Ramsey Clark El-Assal – Barclays Bank PLC – Research Analyst] . . . How meaningful was the tariff headwind on branded online checkout TPV in Q2? And in July, are you seeing a stable tariff-related headwind there? Or is that a metric -- on that same metric, or could we see the headwind change and potentially intensify?
>
> [A: Defendant Chriss] Ramsey, thank you for the question, and I appreciate the comments on branded checkout. ***Look, we're excited as well. I think our execution on the global rollout, the U.S. rollout is exactly what we were looking for.*** And really, the cohorts that we now have live in market are delivering exactly the way we expected. ***To the comment on these platforms from Asia, the way we think about it is, without that pressure, our branded checkout really would have been at 6%. And so it's a small amount, but we've started to see it stabilize a little bit as we get into this month.*** Jamie, anything you'd add?
>
> [A: Defendant Miller] Yes. No, I would just say that our trends underlying all this really have been broadly consistent. There's puts and takes in any given quarter. And like Alex said, we did see a slight deceleration really in those

> Chinese to U.S. corridors. In July, I would say it's still early, but seeing a bit less pressure in that space. We plan the full year with branded checkout at mid-single digits. We are on track for that. And the watchout that I really am looking at is we still have a fair amount of policy and macro uncertainty. So we're obviously monitoring that. But we're very focused on our execution around our strategic initiatives. And bending the curve takes time, and we expect to accelerate as we move through the next couple of quarters and the next couple of years.

122. Also during the question-and-answer segment of the Q2 2025 Earnings Call, the following exchange occurred between an analyst for JP Morgan Chase & Co and Defendant Chriss:

> [Q: Tien-Tsin Huang – JPMorgan Chase & Co. – Senior Analyst] I want to ask about all the initiatives, Alex, that you went through upfront. There's a lot going on, a lot to study. Specifically, I want to ask on Pay with Crypto and PayPal World. Because when you think about this, I can make the case that both are TAM expanding, but potentially at a lower take rate. We've been getting a lot of these questions on both sides. So how do you see it? And are you confident that both will be revenue and profit accretive as you push towards -- I think you call it, interoperability quite a bit in some of the releases.
>
> [A: Defendant Chriss] Thanks, Tien-Tsin. ***So yes, we're very excited, and hopefully, you're seeing the pace of our innovation just continue to accelerate and sort of you're starting to see our whole strategy and the system that we're building together really play out***. Let me take each of those. So PayPal World, I think the easiest way to think about it in the short term is, a, what I'm really excited about is the interoperability between PayPal and Venmo. So now you've got a huge amount of Venmo customers that can click on the PayPal branded checkout and make their purchase online.
>
> ***Then we've opened it up to almost 2 billion additional users, and that will just continue to grow. And the best way to think about it is that's branded checkout***. And the way that we've orchestrated the agreements on PayPal World as a platform is the merchants maintain their branded checkout economics. And so if you're a user and I've gotten a lot of really fun notes in from LinkedIn UPI users that are now thrilled to be able to click on the PayPal button anywhere in the world and be able to make a checkout. And for us, that's just expansion of TAM at the existing economics that we have. And

then on top of that, you've got P2P economics and all sorts of other things that will play out over time. So that's on PayPal World. It really is an expansion of the TAM.

On ***Pay with Crypto, we really do see this as, again, expansion of TAM at pretty attractive economics***. The expenses come down significantly with crypto. This is still early days in consumers really using crypto to pay, but we want to make sure that our merchants are enabled and have the ability to take the payment when they need to. So if you look at the net take rate on Pay with Crypto, it's actually quite attractive. And we'll see how it ramps up over time from a volume perspective. But again, to your question, both are expansion of TAM for us.

123. Moreover, during the question-and-answer segment of the Q2 2025 Earnings Call, the following exchange occurred between an analyst for Mizuho Securities USA LLC and Defendant Chriss:

[Q: Dan Dolev – Mizuho Securities USA LLC – MD & Senior Equity Research Analyst] So can we talk about any benefits you're getting from the upgraded checkout experience? ***Obviously, there should be an uplift in the second half***. Is there any way to quantify that, that would be great.

[A: Defendant Chriss] Yes, Dan, what I'd say is, ***from the cohorts that we've rolled this out to, and remember, this is 15% of global TPV, we're continuing to see the uplift*** that we've talked about, call it, 1 point of uplift. ***So that is going to continue. We just need to roll this out to more***. And so our expectation is if you look at branded checkout overall, it's this new branded experiences, it's the momentum that we've got in buy now, pay later, which we're seeing over 20% year-over-year growth. It's the improvement in Pay with Venmo, which we're seeing 45% year-over-year growth. All of those coming together, we continue to see momentum on.

***And so as we exit this year, I expect that we're going to start to see real improvement in branded checkout overall and then as we move into '26. So this is a big shift. It takes time to move. I'm excited about the momentum we have across all 3 of those elements, the new experiences, buy now, pay later and Pay with Venmo. And I think we're going to start to see this thing turn as we get through the next few quarters and into '26.***

124. In addition, during the question-and-answer segment of the Q2 2025 Earnings

Call, the following exchange occurred between an analyst for Wolfe Research, LLC and Defendants Chriss and Miller:

> [Q: Darrin David Peller – Wolfe Research, LLC – MD & Senior Analyst] Can we touch on how the European rollout of the modern checkout initiatives are coming along now? Just what's the time line on it? When do you anticipate seeing measurable results? And then just overall looking at branded, maybe a little more color on international growth versus U.S. And just revisiting whether you still expect to exit the year at an accelerated rate for branded versus the beginning of the year?
>
> [A: Defendant Chriss] Yes. Thanks, Darrin. So again, just to highlight, ***we were very deliberate in our strategy to start our rollout of our new branded experiences in the U.S. We're up over 60% now in the U.S. And again, the cohorts that we've rolled out are continuing to operate in the way that we wanted and showing the uplift that we expected***, that we talked about in the past.
>
> ***We've now started to roll that out in the U.K. and Germany***. As I mentioned previously, those integrations typically are on newer integrations throughout Europe. And so I actually think ***we're going to continue to accelerate our adoption over the coming quarters across Europe. So very, very excited there***. We're mid-teens overall on global TPV, and we want to see that continue to increase over the next few quarters.
>
> [A: Defendant Miller] Yes. I can jump in here and talk about non-U.S. growth, which I think, Darrin, is where you were taking the second part of this. ***If you look at outside the U.S., again, we're really seeing largely consistent trends here. We continue to take share in Europe, including Germany. And as Alex mentioned, our broad push around our latest innovation, it's not just the latest experience, but it is buy now, pay later. It is the new app and app upgrades and the experience around that***. It's in its NFC, which we had a really successful rollout in the second quarter in Germany around that. ***So it's all around branded checkout, really driving the habituation and the resulting halo that comes with that. And the teams are really focused on scaling that and pushing that as they go through.***
>
> ***With respect to accelerated rate, what I would tell you is that we are laser-focused on branded checkout. And I think as we talk about all of this, that focus on execution, the focus on the strategic initiatives, we fully expect to***

***see an accelerated rate of growth over the next few quarters and the next few years***.

***October 28, 2025 Earnings Call***

125. On October 28, 2025, the Company reported its financial results for the third quarter of 2025. That same day, the Company hosted an earnings call to discuss its financial results for the third quarter of 2025 with investors and analysts (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Chriss stated the following with regard to the Company's Branded Checkout segment, in relevant part:

> ***Thanks to our omnichannel initiatives, we've accelerated branded experiences TPV growth to be between 7% and 8% on a currency-neutral basis over the past 4 quarters***
>
> . . .
>
> Put simply, this is the new PayPal, built for faster, more profitable growth. ***Our strong foundation, differentiated competitive advantages and clear strategic direction position us to capture a massive and growing addressable market***. With building execution momentum, ***we are driving innovation at a remarkable pace and scale. This makes us exceptionally well placed to win into the future***.
>
> . . .
>
> For example, in the third quarter, we reached 10% branded experiences volume growth in the U.S., more than double our growth the same quarter a year ago. That acceleration comes from 2 things: growing omnichannel adoption and sustained improvement in the U.S. online branded checkout trends, supported by our improved experiences.
>
> ***We have the right set of drivers and initiatives in place. Now our focus is on adoption and investing to amplify our impact. As we move into 2026, we will be leaning more into these efforts and expanding across key international markets.***
>
> Let me address online branded checkout in more detail. TPV grew 5% in the third quarter on a currency-neutral basis. ***That's solid growth, especially with***

> ***the choppy global macro trends we continue to see this quarter. Given the competitive intensity online, we know more work is needed to close the gap between our performance and overall e-commerce growth***. Our strategy moving into next year centers on 3 priorities: continuing to scale our redesigned checkout experiences, improving how we are prioritized across merchants and, importantly, driving biometric adoption.

126. Also during the Q3 2025 Earnings Call, Defendant Chriss stated the following with regard to the Company's recent developments, in relevant part:

> I'll highlight just a few of our recent developments. We continue to partner with leaders across the agentic space, including Perplexity earlier this year. And in September, we announced our expansive multiyear partnership with Google to create new AI shopping experiences. This morning, we announced a significant partnership with OpenAI to expand payments and commerce in ChatGPT, including adding PayPal branded checkout for shoppers and payment processing for merchants using Instant Checkout. This is a big win for PayPal and our customers.
>
> Today, we also announced our own agentic commerce services, which help merchants sell through multiple AI platforms, including Google, OpenAI and Perplexity. Merchants will have one integration to access consumers through multiple LLMs. Agentic commerce will take time, but we do believe consumer behavior will shift. PayPal is building for that future.
>
> Finally, I'm very excited to share that PayPal World is officially in its pilot stage, and the first test transactions are happening this week. ***I'm proud of the progress that we've made this quarter from partnerships to new product innovations, to continuing to strengthen our profitability***.

127. In addition, during the Q3 2025 Earnings Call, Defendant Miller discussed the Company's efforts to improve its Branded Checkout segment, stating the following, in relevant part:

> ***The diversification and quality of this growth is a meaningful improvement from where we were at the start of the company's transformation. We have clear opportunities to build on this progress with investments that strengthen our competitive position and drive durable profitable growth***.

> ***We've moved branded experiences to the top of this slide to reflect the importance of this metric to our more expansive strategy and value creation.*** Looking across the product portfolio***, we see encouraging signs that our initiatives are gaining traction and making an impact. Branded experiences TPV, which includes online checkout, PayPal and Venmo debit as well as tap-to-pay posted another quarter of 8% growth***.
>
> As Alex mentioned, U.S. branded experiences TPV growth accelerated to 10% in the quarter, benefiting from both omnichannel adoption and better trends in U.S. online branded checkout.
>
> . . .
>
> ***We remain focused on the initiatives we can control. We're confident in our branded checkout strategy and the road map that our teams are advancing. The early results in the U.S. demonstrate that we're on the right path with our initiatives***, including our redesigned experiences; buy now, pay later; and Pay with Venmo. ***We're laser-focused on execution across the 3 key areas Alex discussed: scaling our redesigned experiences, improving prioritization and driving biometric adoption***. All of this is increasingly complemented by a compelling consumer value prop that differentiates PayPal and Venmo as one of the best, most rewarding ways to pay.
>
> While this work is complex and takes time, ***we fully expect to see our efforts build as we move through the next year and scale these initiatives***. Pay with Venmo and buy now, pay later continue to outpace the market, taking share from other payment methods, growing 40% and 20%, respectively. ***These results give us the confidence to begin making targeted investments in the fourth quarter that amplify the impact of these and other initiatives throughout the portfolio***.

128. Moreover, during the Q3 2025 Earnings Call, Defendant Miller discussed the Company's guidance for the fourth quarter of 2025, stating the following, in relevant part:

> Following another quarter of strong financial performance, ***we are raising our full year guidance for TM dollars and non-GAAP EPS***. For the fourth quarter, we expect currency-neutral revenue growth in the mid-single digits. ***We expect fourth quarter TM to be between $4.02 billion and $4.12 billion, which represents about 3.5% growth at the midpoint. Excluding interest on***

> ***customer balances, we expect TM dollars to grow by about 5% at the midpoint compared to 7% year-to-date***.
>
> Setting interest rates aside, there are a few factors to highlight that impact our fourth quarter outlook. First, we have seen strong credit outperformance over the past year, driven by good execution from the team as well as a more benign loss environment. We expect to see year-over-year comparisons start to normalize more in the fourth quarter.
>
> ***Second, given the performance of some of our key initiatives, we see an opportunity to lean into our competitive differentiation with additional investment to drive faster growth over time***. In the fourth quarter, we will begin increasing investments designed to drive product attachment and habituation. Some of these investments are linked to volumes and, therefore, recorded as contra revenue impacting TM dollars and designed to drive additional growth over time.
>
> Other growth investments such as global brand awareness campaigns, typically sit within marketing and non-transaction OpEx. Lastly, on TM, ***our fourth quarter guide assumes some deceleration in branded checkout growth relative to our third quarter average. From a volume perspective, the most important weeks and months of the quarter still lay ahead. That said, we are planning prudently given recent spending trends and the uncertain macro backdrop. We are also cognizant of lapping strong consumer spending in the fourth quarter of last year***.

129. Also during the Q3 2025 Earnings Call, Defendant Chriss stated the following regarding the Company's overall position for 2025, in relevant part:

> ***We are operating from a position of strength. The results you're seeing are proof that our strategy is working***. We built a more balanced, profitable growth engine across branded experiences, PSP and Venmo, and that's exactly what we set out to do. We're investing in high-impact growth initiatives that will move the needle and future-proofing the business with critical partnership, while simultaneously returning value to shareholders through our buyback program and our newly launched dividend. ***We have moved this business from defense to offense, from stabilization to acceleration. We know exactly where the opportunities are, and we are laser-focused on executing our strategy***.

130. Later during the Q3 2025 Earnings Call, the Individual Defendants conducted

a question-and-answer segment with investors and analysts. During the question-and-answer segment of the Q3 2025 Earnings Call, the following exchange occurred between an analyst for Sanford C. Bernstein & Co., LLC and Defendant Miller regarding the purported benefits of the Company's recent moves to drive Branded Checkout Growth:

> [Harshita Rawat – Sanford C. Bernstein & Co., LLC – Senior Research Associate] So I want to ask about branded. I know you highlighted some headwinds in the 5% growth number. You kind of highlighted some kind of deceleration in the fourth quarter. But I'm also thinking you have some benefit from Pay with Venmo and buy now, pay later promotion in the holiday season. So going back to the Investor Day, you kind of laid out the path to branded acceleration. I know it's not linear. So how should we think about just the overall path from here? Or should we focus more on the Slide 4, right, like that you highlighted, which is very helpful, which kind of focuses on more diversified drivers of growth?
>
> [A: Defendant Miller] Yes. Harshita, maybe I'll answer that in 2 parts. I'll talk about fourth quarter and then really talk about the broader investor framework. ***We've had consistent mid-single-digit growth in branded checkout for multiple quarters now. And for the quarter, we've seen really good momentum across our growth initiatives with buy now, pay later, with Pay with Venmo. And we've seen continued U.S. growth at higher rates as well this quarter***.
>
> ***When we got into September, we began to see macro-related deceleration. And that is both in the U.S. and in Europe. And I talked about it in my prepared remarks, but really a relatively consistent number of transactions, but we're seeing basket sizes just trade down***. Average order value being down, particularly in retail where consumers are just being more selective. ***And that behavior has continued into October. So obviously, it's really early in the fourth quarter. The holiday season is very back-end loaded. So it's something we're watching***. But we did call out, and you're right, ***our guidance assumes a rate of growth lower than third quarter***.
>
> ***And so when you look at that macro and I pivot now to talking about the broader framework, we've seen very good progress. And I think what I'm most excited about is we know what's working, and we're really doubling down against that***. And Alex has talked a lot about buy now, pay later. We've talked a lot about Pay with Venmo. ***And importantly, year-to-date in the U.S.,***

> ***our growth rates are higher than what we saw year-to-date last year in the U.S. So we're really seeing nice progress. But that macro piece of it, whether it's tariffs or some of this deceleration is offsetting our progress. And we set those 2027 targets, assuming a strong -- or assuming a consistent consumer macro environment. And ultimately, that's how we'll measure progress against that.***
>
> ***What I am excited about is we have scaled our initiatives in the U.S. first. And so where we see progress, we've got real confidence as we scale outside of the U.S. and internationally***. I think we've invested in the right products. We're seeing customer adoption and engagement around the things we've talked about in addition to things like omni and places where we get other halo effect. And the investments we're making are really predicated on our confidence in our ability to continue to build on our progress as we get through the next couple of years.

131. Also during the question-and-answer segment of the Q3 2025 Earnings Call, the following exchange occurred between an analyst for Wells Fargo Securities, LLC and Defendants Miller and Chriss:

> [Q: Jason Alan Kupferberg – Wells Fargo Securities, LLC – Equity Analyst] So you obviously had a nice beat here on TM dollars in the quarter. It seems like the branded business came in right in line with your expectations. The OVAS revenues were quite strong. So I wanted to just unpack the sources of TM upside in the quarter a bit, if you can give us a relative sense on how much of that upside came from the credit products versus some of the other drivers? And then just any quick comments on how you see cadence of additional penetration of the new checkout experience moving beyond the 25% level as we move into next year
>
> [A: Defendant Miller] Thanks, Jason. Really, when you look at third quarter transaction margin dollar performance, we had meaningful contribution across each of branded checkout, Venmo, PSP, VAS and credit. And I think what's important there, and we really tried to highlight this in our prepared remarks as well, is that we've got nice diversification not only on the revenue side but on the margin sources. And I think that's demonstrative of that.
>
> [A: Defendant Chriss] Yes. And on the penetration, we talked a little bit about it. But again, just to set the tone, we really started in the U.S. We now are roughly 25% of global transactions. Even under that 25%, though, about half

> were actually optimized. And so we're really working through how do we nail the overall paysheet improvement, the biometrics that we're starting to put together. When all of that comes together, the paysheet and the biometrics, we're actually seeing conversion rates increase 2% to 5%. So we know we have a winning product. It just is taking time.
>
> ***And look, I'm as impatient as anyone, I want to see this move as fast as we can. But we're talking about bending the curve on over $0.5 trillion of spend, and it's just taking time to get there. So we have confidence, as Jamie mentioned earlier, U.S. branded checkout is growing faster year-to-date than it did in '24. So we know the experiences are working. We're now rolling it out in Europe. We expect that to continue through '26***. And in the meantime, we're leaning into BNPL growing north of 20%, Pay with Venmo growing north of 40%. And so we know that overall, in branded checkout, we're on the right path, it's just taking time.

132. The statements in ¶¶113-131 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company's macroeconomic environment contained substantial risks; (2) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

***February 3, 2026 Earnings Press Release***

133. The truth emerged February 3, 2026, when the Company issued the Q4 2025 Earnings Press Release. The Q4 2025 Earnings Press Release stated the following, in relevant part:

> **4Q'25 Financial Results**
>
> • Net revenues increased 4% to $8.7 billion; 3% currency-neutral ("FXN").

- Transaction margin dollars1 ("TM$") increased 3% to $4.0 billion; TM$ excluding interest on customer balances1,2 increased 4% to $3.7 billion.
- GAAP operating income increased 5% to $1.5 billion; non-GAAP operating income increased 3% to $1.6 billion.
- GAAP operating margin expanded 19 basis points to 17.4%; non-GAAP operating margin contracted 9 basis points to 17.9%.
- GAAP EPS increased 38% to $1.533; non-GAAP EPS increased 3% to $1.23.

**FY'25 Financial Results**

- Net revenues increased 4% to $33.2 billion; 4% FXN.
- TM$1 increased 6% to $15.5 billion; TM$ excluding interest on customer balances1,2 increased 6% to $14.2 billion.
- GAAP operating income increased 14% to $6.1 billion; non-GAAP operating income increased 9% to $6.4 billion.
- GAAP operating margin expanded 154 basis points to 18.3%; non-GAAP operating margin expanded 87 basis points to 19.2%.
- GAAP EPS increased 35% to $5.413; non-GAAP EPS increased 14% to $5.31.

(Emphases in original).

134. Moreover, the Q4 2025 Earnings Press Release quoted Defendant Miller as stating the following:

> In 2025, PayPal delivered solid performance across multiple areas of the business. We grew revenue, transaction margin dollars, and earnings per share, underscoring the strength of our increasingly diversified platform. ***At the same time, our execution has not been where it needs to be, particularly in branded checkout. As announced today, the Board's appointment of Enrique Lores as PayPal's next President and CEO reflects a clear commitment to strengthening execution, innovation, and results***. We are fully aligned on the path forward as PayPal enters its next chapter of growth.

***February 3, 2026 Press Release***

135. Also on February 3, 2026, the Company issued the February 2026 Transition Press Release. The February 2026 Transition Press Release announced the appointment of "Enrique Lores as President and CEO, effective March 1, 2026 … succeed[ing] Alex Chriss." The February 2026 Transition Press Release further noted that "[t]o ensure a

seamless transition, Jamie Miller, Chief Financial and Operating Officer, will serve as Interim CEO until Lores assumes the role."

136. Notably, the February 2026 Transition Press Release provided little detail on the abrupt termination of Defendant Chriss from his roles at the Company. However, the February 2026 Transition Press Release did note the following, in relevant part:

> Today's appointment follows a detailed evaluation conducted by the Board of Directors on the current position of the company relative to its competition and the broader industry landscape. ***While some progress has been made in a number of areas over the last two years, the pace of change and execution was not in line with the Board's expectations.*** The Board is confident that the appointment of Lores, a seasoned executive with more than three decades of technology and commercial experience, will provide the leadership necessary to lead PayPal into its next chapter.

***February 3, 2026 Earnings Call***

137. That same day, the Company hosted the Q4 2025 Earnings Call. During the Q4 2025 Earnings Call, Defendant Miller discussed the lackluster performance of the Company's Branded Checkout segment and the overall issues facing the Company, stating the following, in relevant part:

> Last February, we held an Investor Day outlining our transformation strategy. One year later, there are elements working very well, but there are also areas pacing below our expectations, primarily within branded checkout, which I will spend much of my time discussing today.
>
> . . .
>
> Where we haven't made the same progress is in online branded checkout. We've reimagined a product that had been stagnant and underinvested in for years, creating a new value proposition for merchants and consumers, but ***we were too optimistic about how quickly we could drive change and customer adoption across a massive global user base. The results are not yet where we expected them or want them to be. Let me update you on where we are, what is working and the steps we're taking to get back on track***.

For the past few years, we have delivered consistent mid-single-digit TPV growth. However, ***in the fourth quarter, online branded checkout TPV grew 1% on a currency-neutral basis, down from 5% in the third quarter. The 4-point deceleration was more than we expected*** and was concentrated in three main areas, each contributing roughly 1 point or so to the slowdown. First, U.S. retail weakness. We saw pressure across our retail merchant portfolio, particularly among lower and middle income consumers. ***While part of this can be attributed to macro factors and a K-shaped economy, it's also clear that we need to do more to win with key merchants, particularly during high-volume shopping periods***.

Second, international headwinds particularly in Germany, which is one of our largest markets. ***Our German growth has moderated due to macroeconomic softness, normalization of our long-standing market leadership position and competition from alternative payment methods***.

Third, deceleration in several high-growth verticals, specifically in travel, ticketing, crypto and gaming, categories that had strong growth in the fourth quarter of '24 and continuing through much of '25.

***Cutting across all of these, we had operational and deployment issues that amplified the pressure***. To date, our delivery process has started with building a better product and expecting merchants to adopt at scale because of conversion benefits. ***The reality is our merchants, especially the largest ones, have many competing priorities and require much more hands-on integration support than we anticipated, which has slowed our progress***. Additionally, the combination of biometric adoption and competitive presentment have proven critical to branded checkout performance.

So while challenges in the macro environment are real, ***we haven't executed as well as we need to, and our product deployment in the second half of the year was slower than we planned***.

. . .

First, a relentless focus on the highest impact merchants. ***To date, we've been optimizing for every merchant, and that approach has slowed our ability to move quickly on what matters most. We're changing our approach to focus on strategic merchants, representing nearly 25% of our branded checkout volume today but could be much larger***. In January, we formed dedicated

teams to implement improvements across experience, presentment and selection for these merchants.

Second, focus on implementing experience and biometrics together, not sequentially***. In too many cases, we were deploying our redesigned checkout without biometric enablement, which does not deliver the full conversion lift we know we can provide. That's changing***. We're now deploying experience and biometrics together as a package more consistently. When we integrate a merchant on to our latest experience, we will simultaneously run biometric adoption campaigns, targeting their consumer base.

. . .

Third is a focus on presentment. It is just as critical as experience. As I mentioned before, when we secure a competitive placement on a merchant site, we perform significantly better.

. . .

Fourth, a focus on giving consumers a reason to come back

. . .

***For branded checkout, our focus is on narrowing the gap with the market over time. Following our fourth quarter performance, we need to prove that out in coming quarters and years.*** There are multiple ways for us to deliver profitable growth over the long term, and 2025 was a great example of that. But ***given everything I've outlined, we are no longer committing to the specific outlook for 2027 we laid out at Investor Day last year.***

***For these reasons, we think it's prudent for now to provide financial guidance 1 year at a time***. And Steve will speak in more detail about how we're thinking about 2026 as a starting point. The strategy I outlined today focuses on three fundamentals: experience, presentment and selection. And ***these critical changes to our go-to-market approach*** will lay the groundwork for a stronger, more competitive online branded checkout business over time.

In closing, while ***we're not satisfied with our online branded checkout performance today,*** we are confident in the plan to stabilize and strengthen it. Importantly, we are executing with multiple competitive advantages. Our scale, our trusted brand, deep consumer and merchant relationships and

diversified growth drivers give us resilience and flexibility moving forward.

138. Also during the Q4 2025 Earnings Call, the Company's Chief Investor Relations Officer, Steven Eric Winoker, stated the following, in relevant part:

> TM dollars excluding interest grew 4% in the fourth quarter. The drivers of that growth were broad-based, led by strong credit performance, PSP profitability, Venmo monetization and loss improvement across multiple products. This diversification was ***key in offsetting the headwinds to branded checkout***
>
> . . .
>
> On an ***online-only branded checkout basis, volume grew 1% on a currency-neutral basis***, impacted by the factors that Jamie discussed in depth earlier. I'll talk more about how we are planning for the current year shortly.
>
> . . .
>
> As Jamie discussed, ***we are no longer providing the specific multiyear growth outlook we presented at our Investor Day*** a year ago. ***As it relates to branded checkout, our prior outlook assumed a more stable e-commerce environment and a certain pace of product rollout and merchant adoption. Neither has materialized to date as we anticipated***. And while we can point to a number of constructive indicators, ***it's hard to call the precise time frame when we will see an overall inflection for branded***. ***Branded checkout represents over half our profit dollars***, and we're confident the product, channel and marketing investments we're making will drive improvement and acceleration over time.

139. On this news, the price per share of the Company's common stock fell $10.63, or approximately 20.3%, from a closing price of approximately $52.33 per share at the close of trading on February 2, 2026 to close at $41.70 per share on February 3, 2026.

## <u>REPURCHASES DURING THE RELEVANT PERIOD</u>

140. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $4.9 billion to repurchase

approximately 73.6 million shares of its own common stock at artificially inflated prices from March 2025 through December 2025.

141. According to the Form 10-Q the Company filed with the SEC on April 29, 2025, between March 1, 2025 and March 31, 2025, the Company repurchased 7.1 million shares of its own common stock at an average price per share of approximately $69.27, for a total cost to the Company of approximately $491.8 million.

142. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $195.7 million for repurchases of its own stock between March 1, 2025 and March 31, 2025.

143. According to the Form 10-Q the Company filed with the SEC on July 29, 2025 (the "Q2 2025 10-Q"), between April 1, 2025 and April 30, 2025, the Company repurchased 8.3 million shares of its own common stock at an average price per share of approximately $62.24, for a total cost to the Company of approximately $516.6 million.

144. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $170.5 million for repurchases of its own common stock between April 1, 2025 and April 30, 2025.

145. According to the Q2 2025 10-Q, between May 1, 2025 and May 31, 2025, the Company repurchased 7.3 million shares of its own common stock at an average price per share of approximately $70.57, for a total cost to the Company of approximately $515.2 million.

146. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $210.8 million for repurchases of its own common stock between May 1, 2025 and May 31, 2025.

147. According to Q2 2025 10-Q, between June 1, 2025 and June 30, 2025, the Company repurchased 6.5 million shares of its own common stock at an average price per share of approximately $72.39, for a total cost to the Company of approximately $470.5 million.

148. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $199.5 million for repurchases of its own common stock between June 1, 2025 and June 30, 2025.

149. According to the Form 10-Q the Company filed with the SEC on October 28, 2025 (the "Q3 2025 10-Q"), between July 1, 2025 and July 31, 2025, the Company repurchased 7 million shares of its own common stock at an average price per share of approximately $74.75, for a total cost to the Company of approximately $523.3 million.

150. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $231.4 million for repurchases of its own common stock between July 1, 2025 and July 31, 2025.

151. According to the Q3 2025 10-Q, between August 1, 2025 and August 31, 2025, the Company repurchased 7.3 million shares of its own common stock at an average price per share of approximately $68.85, for a total cost to the Company of approximately $502.6 million.

152. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $198.2 million for repurchases of its own common stock between August 1, 2025 and August 31, 2025.

153. According to the Q3 2025 10-Q, between September 1, 2025 and September 30, 2025, the Company repurchased 7 million shares of its own common stock at an average price per share of approximately $67.92, for a total cost to the Company of approximately $475.4 million.

154. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $183.5 million for repurchases of its own common stock between September 1, 2025 and September 40, 2025.

155. According to the Form 10-K the Company filed with the SEC on February 3, 2026 (the "2025 10-K"), between October 1, 2025 and October 31, 2025, the Company repurchased 7.8 million shares of its own common stock at an average price per share of

approximately $70.20, for a total cost to the Company of approximately $547.6 million.

156. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by $222.3 million for repurchases of its own common stock between October 1, 2025 and October 31, 2025.

157. According to the 2025 10-K, between November 1, 2025 and November 30, 2025, the Company repurchased 7.1 million shares of its own common stock at an average price per share of approximately $63.81, for a total cost to the Company of approximately $453.1 million.

158. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $157 million for repurchases of its own common stock between November 1, 2025 and November 30, 2025.

159. According to the 2025 10-K, between December 1, 2025 and December 31, 2025, the Company repurchased 8.2 million shares of its own common stock at an average price per share of approximately $60.91, for a total cost to the Company of approximately $499.5 million.

160. As the Company's stock was actually worth only $41.70, the price at closing on February 3, 2026, the Company overpaid by approximately $157.5 million for repurchases of its own common stock between December 1, 2025 and December 31, 2025.

161. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $1.9 billion.

## DAMAGES TO PAYPAL

162. As a direct and proximate result of the Individual Defendants' conduct, PayPal has lost and will continue to lose and expend many millions of dollars.

163. Such losses include the approximately $1.9 billion the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

164. Such expenditures include, but are not limited to, legal fees, costs, and any

payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

165. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

166. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

167. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

168. As a direct and proximate result of the Individual Defendants' conduct, PayPal has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

169. Plaintiff brings this action derivatively and for the benefit of PayPal to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PayPal, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

170. PayPal is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

171. Plaintiff is, and has been at all relevant times, a shareholder of PayPal.

Plaintiff will adequately and fairly represent the interests of PayPal in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

172. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

173. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, PayPal's Board consisted of the following ten individuals: Defendants Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the ten Directors-Defendants that were on the Board at the time this action was filed.

174. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

175. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted PayPal to issue materially false and misleading statements. Specifically, the Director-Defendants caused PayPal to issue false and misleading statements which were intended to make PayPal appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls while six of the Individual Defendants engaged in lucrative insider sales netting proceeds of approximately $12.4 million. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

176. In addition, the Director-Defendants caused the 2025 Proxy Statement to call

for a shareholder vote to approve the 2025 Amendment of the 2015 Equity Incentive Plan, thereby increasing the number of shares available for issuance thereunder by 15 million shares. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment of the 2015 Equity Incentive Plan, and they would not have likely approved such amendment had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2025 Amendment of the 2015 Equity Incentive Plan at the annual meeting of the stockholders on June 5, 2025, there were 46,711,814 shares available under the Amended and Restated 2015 Equity Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the 2025 Proxy Statement and the shareholders approving the 2025 Amendment of the 2015 Equity Incentive Plan that made an additional 15 million shares available under the Amended and Restated 2015 Equity Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

177. Additional reasons that demand on Defendant Chik is futile follow. Defendant Chik has served as a Company director since March 10, 2025. Defendant Chik currently serves as a member of the ARC Committee. In addition, Defendant Chik receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Chik solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of

the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Chik breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178. Additional reasons that demand on Defendant Christodoro is futile follow. Defendant Christodoro has served as a Company director since July 2015. Defendant Christodoro currently serves as a member of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. In addition, Defendant Christodoro receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Christodoro solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Christodoro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179. Additional reasons that demand on Defendant Di Sibio is futile follow. Defendant Di Sibio has served as a Company director since July 2024. Defendant Di Sibio currently serves as a member of the ARC Committee. In addition, Defendant Di Sibio receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Di Sibio solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Di Sibio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180. Additional reasons that demand on Defendant Dorman is futile follow. Defendant Dorman has served as a Company director since June 2015 and as the Chairman of the Board since February 2, 2026. Defendant Dorman currently serves as the Chair of the Compensation Committee and as a member of the Corporate Governance and Nominating Committee. In addition, Defendant Dorman receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Dorman solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Dorman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is

futile and, therefore, excused.

181. Additional reasons that demand on Defendant Lores is futile follow. Defendant Lores has served as the Company's President and CEO since March 1, 2026, and as a Company director since June 2021. Previously, Defendant Lores served as the Company's Chairman of the Board from July 23, 2024 until February 2, 2026. Defendant Lores currently serves as a member of the ARC Committee. Thus, as the Company admits, he is not an independent director. In addition, Defendant Lores receives handsome compensation from the Company for his role as a director and officer, as this is his primary occupation. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Lores solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Lores breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182. Additional reasons that demand on Defendant McGovern is futile follow. Defendant McGovern has served as a Company director since June 2015. Defendant McGovern currently serves as the Chair of the Corporate Governance and Nominating Committee and as a member of the Compensation Committee. In addition, Defendant McGovern receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded

her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant McGovern solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Additionally, Defendant McGovern's insider sales, made while the Company's stock was artificially inflated as a result of the false and misleading statements herein, further demonstrate her motive in facilitating and participating in the scheme. For these reasons, too, Defendant McGovern breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

183. Additional reasons that demand on Defendant Messemer is futile follow. Defendant Messemer has served as a Company director since January 2019. Defendant Messemer currently serves as a member of the ARC Committee. In addition, Defendant Messemer receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Messemer solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Additionally, Defendant

Messemer's insider sale, made while the Company's stock was artificially inflated as a result of the false and misleading statements herein before the scheme was exposed, further demonstrates her motive in facilitating and participating in the scheme. For these reasons, too, Defendant Messemer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

184. Additional reasons that demand on Defendant Moffett is futile follow. Defendant Moffett has served as a Company director since June 2015. Defendant Moffett currently serves as the Chair of the ARC Committee. In addition, Defendant Moffett receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Moffett solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Moffett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185. Additional reasons that demand on Defendant Sarnoff is futile follow. Defendant Sarnoff has served as a Company director since June 2017. Defendant Sarnoff currently serves as a member of the ARC Committee. In addition, Defendant Sarnoff receives handsome compensation for her role as a Company director. As a trusted, long-time Company director, she conducted little, if any, oversight of the scheme to cause the

Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Also, Defendant Sarnoff solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Sarnoff breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

186. Additional reasons that demand on Defendant Yeary is futile follow. Defendant Yeary has served as a Company director since July 2015. Defendant Yeary currently serves as a member of the ARC Committee. In addition, Defendant Yeary receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Also, Defendant Yeary solicited the materially false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2015 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Yeary breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187. Additional reasons that demand on the Board is futile follow.

188. Defendants Moffett (as Chair), Chik, Di Sibio, Messemer, Sarnoff, and Yeary served as members of the ARC Committee at all relevant times (collectively, the "ARC Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the ARC Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the ARC Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

189. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

190. PayPal has been and will continue to be exposed to significant losses due to

the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for PayPal any part of the damages PayPal suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

191. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

192. The acts complained of herein constitute violations of fiduciary duties owed by PayPal's officers and directors, and these acts are incapable of ratification.

193. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of PayPal. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of PayPal, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the

Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

194. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause PayPal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

195. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary for Violations of Section 14(a) of the Exchange Act**

196. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

198. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material

fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

199. Under the direction and watch of Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

200. The 2025 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's macroeconomic environment contained substantial risks; (2) as a result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

201. In the exercise of reasonable care, Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2025 Proxy Statement, including, but not limited to, the re-election of directors and approval of the 2025 Amendment of the 2015 Equity Incentive Plan.

202. As a result of Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Chriss, Chik, Christodoro, Di Sibio, Dorman, Lores, McGovern, Messemer, Moffett, Sarnoff, and Yeary to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on advisory basis, the compensation for the Company's named executive officers; (3) approve the 2025 Amendment to the 2015 Equity Incentive Plan; and (4) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent auditor for 2025.

203. The Company was damaged as a result of Defendants Chriss's, Chik's, Christodoro's, Di Sibio's, Dorman's, Lores's, McGovern's, Messemer's, Moffett's, Sarnoff's, and Yeary's material misrepresentations and omissions in the 2025 Proxy Statement.

204. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

205. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206. The Individual Defendants, by virtue of their positions with PayPal and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of PayPal and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause PayPal to engage in the illegal conduct and practices complained of herein.

207. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

208. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

209. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding PayPal. Not only is PayPal now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon PayPal by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging PayPal.

210. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

211. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PayPal not misleading.

212. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by PayPal.

213. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

214. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

215. Plaintiffs, on behalf of PayPal, have no adequate remedy at law.

**FOURTH CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

216. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

217. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PayPal's business and affairs.

218. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PayPal.

220. Also in breach of their fiduciary duties owed to PayPal, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's macroeconomic environment contained substantial risks; (2) as a

result of the risks associated with the Company's macroeconomic environment, its Branded Checkout offerings were unlikely to meet the Company's 2027 targets despite various Company initiatives; (3) due to the foregoing, the Company would have to suspend its specific multiyear growth outlook and reduce its guidance; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

221. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

222. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

223. In yet further breach of their fiduciary duties, during the Relevant Period, while the Company's common stock was at artificially inflated prices before the fraud was exposed, the Individual Defendants caused the Company to repurchase millions of shares of Company stock at artificially inflated prices, while six of the Individual Defendants engaged in lucrative insider sales, netting combined proceeds of approximately $12.4 million.

224. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities.

225. The Individual Defendants had actual or constructive knowledge that they had

caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

226. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PayPal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

**FIFTH CLAIM**

**Against the Individual Defendants for Unjust Enrichment**

229. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

230. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PayPal.

231. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from PayPal that was tied to the performance or artificially inflated valuation of PayPal, or received

compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

232. Plaintiff, as a shareholder and a representative of PayPal, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

233. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## SIXTH CLAIM

## Against the Individual Defendants for Abuse of Control

234. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PayPal, for which they are legally responsible.

236. As a direct and proximate result of the Individual Defendants' abuse of control, PayPal has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

237. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## SEVENTH CLAIM

## Against the Individual Defendants for Gross Mismanagement

238. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PayPal in a manner

consistent with the operations of a publicly held corporation.

240. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, PayPal has sustained and will continue to sustain significant damages.

241. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

242. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## EIGHTH CLAIM
## Against Individual Defendants for Waste of Corporate Assets

243. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

245. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused PayPal to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

246. In addition, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby wasting the Company's assets.

247. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

248. Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## NINTH CLAIM
## Against Defendants Chriss, Miller, Keller, and Scotti for Contribution Under Sections 10(b) and 21D of the Exchange Act

249. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

250. PayPal and Defendants Chriss, Miller, Keller, and Scotti are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Chriss's, Defendant Miller's, Defendant Keller's, and Defendant Scotti's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

251. Defendants Chriss, Miller, Keller, and Scotti because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

252. Accordingly, Defendants Chriss, Miller, Keller, and Scotti are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

253. As such, PayPal is entitled to receive all appropriate contribution or indemnification from Defendants Chriss, Miller, Keller, and Scotti.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of PayPal, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided

and abetted the breach of their fiduciary duties to PayPal;

(c) Determining and awarding to PayPal the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing PayPal and the Individual Defendants to take all necessary actions to reform and improve PayPal's corporate governance and internal procedures to comply with applicable laws and to protect PayPal and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of PayPal to nominate at least five candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding PayPal restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiff hereby demands a trial by jury.

Dated: March 11, 2026

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/Robert C. Moest*

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

# VERIFICATION

I, Alberto Goncalves, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of March 2026.

Signed by:
Alberto Goncalves
62AC1A1B3EB1487...

Alberto Goncalves